# CASE LAW

---

## Loislaw Federal District Court Opinions

---

M.A. v. VILLAGE VOICE MEDIA HOLDINGS (E.D.Mo. 8-15-2011)

M.A., a minor, by and through her Natural Mother and Next Friend, P.K.,

Plaintiff, v. VILLAGE VOICE MEDIA HOLDINGS, LLC., d/b/a backpage.com, and

BACKPAGE.COM, LLC, Defendants.

Case No. 4:10cv1740 TCM.

United States District Court, E.D. Missouri, Eastern Division.

August 15, 2011

### MEMORANDUM AND ORDER

THOMAS MUMMERT III, Magistrate Judge

This is a two-count civil action having its genesis in the horrific victimization of M.A. by Latasha Jewell McFarland.[fn1] M.A. seeks to hold defendants Village Voice Media Holdings, LLC, and Backpage.com, LLC (hereinafter collectively referred to as Backpage) liable for this victimization. Backpage moves to dismiss the amended complaint.

### Background

McFarland was indicted in May 2010 for violations of 18 U.S.C. § 1591(b)(2) (prohibiting sex trafficking of children), 18 U.S.C. § 1952(a)(3) (prohibiting the use of interstate commerce to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity"), and 18 U.S.C. § 2422(b) (prohibiting the use of interstate commerce to "knowingly persuade[], induce[], entice[], or coerce[] any individual who has not attained the age of 18 years, to engage in
**Page 2**
prostitution. . . ."). See United States v. McFarland, No. 4:10cr0266 SNLJ (E.D. Mo. May 12, 2010). Four months later, she pled guilty to one of the three counts; specifically, to the count alleging a violation of § 1952(a)(3). Id. Her sentence includes a restitution requirement of $16,830.18 plus additional costs, "including future counseling costs of victim." Id.

Shortly after McFarland pled guilty, M.A. filed this action. In Count I, she seeks to hold Backpage liable under 18 U.S.C. § 2255.[fn2] Because the question before the Court must be answered by an examination of the amended complaint, portions of that complaint are set forth below. The allegations focusing on the injury to M.A. are as follows.

That in 2009 and 2010 Plaintiff M.A., a minor, while being a fourteen year old runaway child, was being sexually trafficked by Latasha Jewell McFarland, an adult, who has pled guilty to criminal charges and has been sentenced relating to the allegations herein and has admitted to the following facts in open court which

are stated as facts hereinafter; she photographed minor
M.A. displaying private body parts in sexual
pornographic poses; she posted this child pornography
on [Backpage's] website, backpage.com in advertisements
seeking payment for sex; she paid backpage.com for
these sex ad postings; she reposted ads; she
transported minor M.A. for the purposes of multiple
sexual liaisons for money with adult male customers
obtained through [Backpage's] website; she collected
money for minor M.A.'s sexual services from these
customers; and she purchased goods to facilitate these
sexual services.

(Am. Compl. ¶ 10.)
**Page 3**

Anticipating Backpage's defense of immunity under the
Communications Decency Act (CDA), **47 U.S.C. § 230**, M.A. describes
Backpage as follows.

8. [A]t all relevant times herein [Backpage] operated
an online classified marketing advertisement website in
interstate commerce that allows the public to post for
a fee, classified advertising for goods and services
including categorized advertising for escorts under the
adult section which also includes categories for
transsexuals, strippers, body rubs, domination and
fetish, and adult jobs. . . .

9. [Backpage is an] Information Content Provider []
within **47 U.S.C. 230** in that [Backpage was] responsible
in part for the development and/or creation of
information provided through the internet or other
internet computer service in that: [Backpage's] website
also has a search engine to allow focused searches by
keywords of the postings; [Backpage] developed the
value and impact of the posted ad alleged herein by
creating the highly viewed website, wherein [Backpage]
advertised that there are billions of page views of
their ads per week and the website is a highly tuned
marketing site with search tools, adult sex focused
categories, and directions and features offered
regarding how to increase the impact of your ad for a
fee; [Backpage] offer[s] special ad placement for a
fee; [Backpage] offer[s] automatic reposting to a top
spot for a fee; [Backpage] offer[s] knowledge regarding
how to post ads and pay anonymously; [Backpage]
advertise[s] its website to increase page views of the
ads; [Backpage] remove[s] spam from its website to
increase page views of placed ad; [Backpage] offer[s]
commissions to customers for referrals of other
customers; and [Backpage] enable[s] viewers and posters
to search and review popular searches; [Backpage has]
posting rules and limitations which aid in the sight
veiling of illegal sex services ads to create the veil
of legality.

. . .

11. In 2009 and 2010, [Backpage] posted many
advertisements which included explicit nude photographs
of Plaintiff, M.A., a minor, advertising her services

as an escort for sex on backpage.com and received fees
for each posting.

12. That [Backpage] had knowledge that: explicit sexual
pornographic photographs were being posted on its
website; that postings on their website were
advertisements for prostitution; that numerous minors
were included in these postings for prostitution on its
website; that sex trafficking of minors is prolific in
the United States of America; that the internet,
including their website, was used for advertisements
for illegal sexual contact with minors;

**Page 4**

that on numerous prior occasions [Backpage was] made
aware of minors being trafficked on their website; that
according to [Backpage], on five prior occasions
[Backpage] responded to subpoenas involving the
trafficking of minors on backpage.com and this does not
include other cases involving minors of which [Backpage
is] aware wherein [Backpage] cooperated with
authorities without subpoenas.

13. By posting explicit nude photographs of Plaintiff,
M.A., a minor, in an advertisement which advertised her
services as an escort for sex on backpage.com,
[Backpage] facilitated child sex trafficking and aided
and abetted McFarland in violating each criminal
statute and United States Treaty Optional Protocol
herein alleged, in that: [Backpage] had a strong
suspicion that the aforementioned crimes were being
committed yet was so indifferent that [it] failed to
investigate for fear of what it would learn; [Backpage]
had a desire that these posters accomplished their
nefarious illegal prostitution activities so that the
posters would return to the website and pay for more
posting; and [Backpage] continued to maintain their
website so as to participate in these illegal
transactions. . . .

(Am. Compl. ¶ 8-9, 11-13.)

   Also in anticipation of Backpage's § 230 defense, M.A. alleges
that there is no immunity because Backpage (a) has aided and
abetted crimes against her, in violation of the statutes listed
in § 2255, see note 2, supra, and (b) has violated her primary
rights under the Optional Protocol to the Convention on the
Rights of the Child on the Sale of Children, Child Prostitution
and Child Pornography. (Id. ¶ 15-[18].**[fn3]**)

   In Count II of her amended complaint, M.A. seeks to hold
Backpage liable under **18 U.S.C. § 1595[fn4]** for the conduct alleged
in Count I.

**Page 5**

   As anticipated, Backpage moves to dismiss under Federal Rule of
Civil Procedure **12**(b)(6) for failure to state a claim. The
specific arguments and the opposition thereto are discussed
below.

## Discussion

Standard of Review. When ruling on a Rule 12(b)(6) motion to

dismiss for failure to state a claim, the Court must take as true the alleged facts and determine whether they are sufficient to raise more than a speculative right to relief. **Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56** (2007). The Court does not, however, accept as true any allegation that is a legal conclusion. **Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949-50** (2009). The complaint must include "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" **Twombly, 550 U.S. at 555** (quoting first Fed.R.Civ.P. **8**(a)(2) and then Conley v. Gibson, **355 U.S. 41, 47** (1957)) (alteration in original); see also **Gregory v. Dillard's Inc., 565 F.3d 464, 473** (8th Cir. 2009) (en banc). Although detailed factual allegations are not necessary, a complaint that contains only "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." **Twombly,**
Page 6
**550 U.S. at 555**; accord **Iqbal, 129 S.Ct. at 1949**. The complaint must set forth "enough facts to state a claim to relief that is plausible on its face." **Twombly, 550 U.S. at 570**; accord **Iqbal, 129 S.Ct. at 1949**; **Brown v. Medtronic, Inc., 628 F.3d 451, 459** (8th Cir. 2010); **Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594** (8th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." **Iqbal, 129 S.Ct. at 1949**. If the claims are only conceivable, not plausible, the complaint must be dismissed. **Twombly, 550 U.S. at 570**; accord **Iqbal, 129 S.Ct. at 1950**. Also, in considering a Rule 12(b)(6) motion, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." **Braden, 588 F.3d at 594**. The issue in considering such a motion is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of the claim. See **Neitzke v. Williams, 490 U.S. 319, 327** (1989).

Standing. Before addressing the merits of the parties' competing positions, the Court finds it necessary to define the injury at issue. M.A. describes that injury in her amended complaint as being photographed by McFarland in pornographic poses, having those photographs posted**[fn5]** on Backpage's website**[fn6]** and used to advertise her for sex, and being
Page 7
transported and subjected to sexual liaisons with adult males who responded to the advertisements. (Am. Compl. ¶¶ 10, [26].) In her memorandum in opposition to the motion to dismiss, however, M.A. argues that she is not suing Backpage for the content of the postings**[fn7]** by McFarland but for the creation and maintenance of a particular website. (Pl. Mem. at 3-4.)

"'Under **Article III of the United States Constitution**, federal courts may only adjudicate actual cases or controversies.'" **Constitution Party of S.D. v. Nelson, 639 F.3d 417, 420** (8th Cir. 2011) (quoting Pucket v. Hot Springs Sch. Dist. No. 23-2, **526 F.3d 1151, 1157** (8th Cir. 2008)). "To satisfy the 'irreducible constitutional minimum' of Article III standing, a plaintiff must establish that he or she has suffered an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'; that there is 'a causal connection between the injury and the conduct complained of'; and that it is

`likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" **Id.** (quoting Lujan v. Defenders of Wildlife, **504 U.S. 555, 560-61** (1992)); accord **Sierra Club v. Kimbell, 623 F.3d 549, 556** (8th Cir. 2010).

The actual injury suffered by M.A. is, as she describes it, her victimization by McFarland. See **Pucket, 526 F.3d at 1157** (explaining that the injury required for standing be "concrete, not conjectural or hypothetical") (internal quotations omitted). That injury has its origins, according to the amended complaint, in the postings of the advertisements by

**Page 8**

McFarland. Absent the content of those postings, M.A. would lack the injury in fact required for Article III standing. The means used to accomplish that injury is the posting of advertisements of Backpage's website. Whether she has a cause of action against Backpage is addressed below, but is a separate concept from that of Article III standing. See **Braden, 588 F.3d at 591**. "[A] plaintiff may be able to assert causes of action which are based on conduct that harmed [her], but which sweep more broadly than the injury [s]he personally suffered." **Id.** at 592.

Thus, the content of the posted advertisements is not, as M.A. urges, irrelevant to the question of § 230 immunity.

Section 230 Immunity. Leaving no doubt about the impetus behind § 230's immunity, Congress set forth its findings and policy in the statute itself.

**(a) Findings**

The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**Page 9**

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States —

**(1)** to promote the continued development of the
Internet and other interactive computer services and
other interactive media;

**(2)** to preserve the vibrant and competitive free market
that presently exists for the Internet and other
interactive computer services, unfettered by Federal or
State regulation;

**(3)** to encourage the development of technologies which
maximize user control over what information is received
by individuals, families, and schools who use the
Internet and other interactive computer services;

**(4)** to remove disincentives for the development and
utilization of blocking and filtering technologies that
empower parents to restrict their children's access to
objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal
laws to deter and punish trafficking in obscenity,
stalking, and harassment by means of computer.

**47 U.S.C. § 230**(a) and (b). Thus, "[a]s a matter of policy,
`Congress decided not to treat providers of interactive computer
services like other information providers such as newspapers,
magazines or television and radio stations, all of which may be
held liable for publishing obscene or defamatory material written
or prepared by others.'" **Batzel v. Smith, 333 F.3d 1018, 1026**
(9th Cir. 2003) (quoting Blumenthal v. Drudge, **992 F. Supp. 44,
49** (D.D.C. 1998)).

   Section 230 defines an "interactive computer service" as "any
information service, system, or access software provider that
provides or enables computer access by multiple
**Page 10**
users to a computer server, including specifically a service or
system that provides access to the Internet. . . ."
**47 U.S.C. § 230**(f)(2). An "information content provider" is "any person or
entity that is responsible, in whole or in part, for the creation
or development of information provided through the Internet or
any other interactive computer service." **47 U.S.C. § 230**(f)(3).
Additionally, "[n]o provider or user of an interactive computer
service shall be treated as the publisher or speaker of any
information provided by another information content provider."
**47 U.S.C. § 230**(c)(1). "Read together, these [last two] provisions
bar [a] plaintiff[] from holding ISPs [internet service
providers] legally responsible for information that third parties
created and developed." **Johnson v. Arden, 614 F.3d 785, 791** (8th
Cir. 2010). "'Congress thus established a general rule that
providers of interactive computer services are liable only for
speech that is properly attributable to them.'" **Id.** (quoting
Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., **591 F.3d 250,
254** (4th Cir. 2009). Consequently, "'[t]he majority of federal
circuits have interpreted [§ 230] to establish broad federal
immunity to any cause of action that would make service providers
liable for information originating with a third-party user of the
service.'" **Id.** (quoting Almeida v. Amazon.com, Inc.,
**456 F.3d 1316, 1321** (11th Cir. 2006)); accord **Perfect 10, Inc. v. CCBill
LLC, 488 F.3d 1102, 1118** (9th Cir. 2007). See also **Doe v.
MySpace, Inc., 528 F.3d 413, 418** (5th Cir. 2008) ("Courts have

construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content.").

Backpage is a website operator. (See Am. Compl. ¶ 8.) As such, it "`can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But

**Page 11**

as to content that it creates itself, or is responsible in whole or in part for creating or developing, the website is also a content provider.'" **Stayart v. Yahoo! Inc., 651 F. Supp.2d 873, 886** (E.D. Wis. 2009) (quoting Roommates.com, **521 F.3d at 1167**).

M.A. argues that Backpage is not a service provider for purposes of § 230's immunity because, in part, (a) its website has a search engine for adult categories that allows searches of postings by keywords; (b) it "developed the value of the posted ads by working to create a highly viewed website"; (c) its website is claimed to be a "highly tuned marketing site"; (d) the website has instructions, for a fee, on how to increase the impact of the posted ads; and (e) it "offers special ad placement and re-posting for a fee." (Pl. Mem. at 3.) None of these characteristics distinguish Backpage from other ISPs that courts have found to be within the reach of § 230 immunity.

"Today, the most common interactive computer services are websites." **Roommates.com, 521 F.3d at 1162** n. 6. "A web site . . . `enables computer access by multiple users to a computer server,' namely the server that hosts the web site." **Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 419** (1st Cir. 2007) (quoting 47 U.S.C. § 230(f)(2)). See also **Faegre & Benson, LLP v. Purdy, 367 F.Supp.2d 1238, 1249** (D. Minn. 2005) (operator of website on which Internet users could post comments was ISP); accord **Gregerson v. Vilana Fin., Inc.,** 2008 WL 451060, *9 (D. Minn. Feb. 15, 2008); **Whitney Info. Network, Inc. v. Xcentric Ventures, LLC,** 2008 WL 450095, *8 n. 22 (M.D. Fla. Feb. 15, 2008). Backpage's operation of a website, without more, does not defeat § 230 immunity.

**Page 12**

Nor does Backpage's use of a search engine to allow keyword searches of postings in its adult categories abrogate that immunity. "A key word is a search term that a user types into a search engine to locate websites or other content online." E-Commerce at Glossary 29-30. "A search engine allows users to find information by entering a search term, [for instance, a keyword,] and receiving a list of results." **800-JR Cigar, Inc. v. GoTo.com, Inc., 437 F.Supp.2d 273, 277** (D. N.J. 2006).

In the case of **Jurin v. Google, Inc., 695 F. Supp. 2d 1117** (E.D. Cal. 2010), the court concluded that Google was entitled to § 230 immunity from claims that it was violating state and federal laws by using plaintiff's trademarked name "Styrotrim" as a suggested keyword in its "AdWords" program. **Id.** at 1119. This program allowed advertisers to bid on keywords, thereby securing a more visible placement of their "Sponsored Link" ads when the keyword is searched for. **Id.** The AdWords program picked up "Styrotrim" as a commonly searched term and suggested it as a keyword to bidders. **Id.** at 1120. Consequently, successful bidders, including plaintiff's competitors, appeared as a "Sponsored Link" whenever plaintiff's trademarked name

"Styrotrim" was used as a keyword. **Id.** Plaintiff argued that Google participated in the content of the advertisements by employing its keyword suggestion tool and was, therefore, an "information content provider." **Id.** at 1122. The court disagreed, holding that "[b]y suggesting keywords to competing advertisers [Google] merely helps third parties to refine their content. This is tantamount to the editorial process protected by the CDA." **Id.** at 1123. The keyword suggestion tool was a "`neutral tool,' that [did] nothing more than provide options that advertisers could adopt or reject at

**Page 13**

their discretion, thus entitling the operator to immunity." **Id.** And, in **Rosetta Stone, Ltd. v. Google, Inc., 732 F. Supp.2d 628** (E.D. Va. 2010), the court rejected a similar trademark challenge by the plaintiff to Google's use of keywords in its AdWords program, finding that Google was "simply assist[ing] third party advertisers in refining their selected keyword terms" and that providing this assistance and making available keyword tools was an exercise of editorial discretion and not the creation of the Sponsored Link contents. **Id.** at 633. See also **MySpace, Inc., 528 F.3d at 420** (rejecting argument that website's search features qualified it as information content provider for purposes of § 230 immunity); **Stayart,** 651 F. supp.2d at 885 (finding Yahoo! entitled to § 230 immunity when it only displayed objected-to content in response to a computer user's search result and noting that "the only way Yahoo! could exert any control over the results of a search engine query would be to change its underlying, proprietary algorithm. This goes to the heart of Yahoo!'s role as an interactive computer service.").

Additionally, the creation by Backpage of an "adult" category does not impose liability on Backpage for ads posted in that category. In **Dart v. Craigslist, Inc., 665 F.Supp.2d 961** (N.D. Ill. 2009), the court found § 230 immunity protected a website from claims that the website facilitated prostitution. The plaintiff alleged that users routinely posted ads promising sex for money under the "erotic services" section of the website's classifieds. **Id.** at 962. "Craigslist created the categories, but its users create the content of the ads and select which categories their ads will appear in." **Id.** Moreover, the word-search

**Page 14**

function provided by Craigslist "[did] not cause or induce anyone to create, post, or search for illegal content." **Id.** at 969.

The complained-of actions taken by Backpage to increase the revenues it derives from its website, e.g., touting its website as a "highly tuned marketing site" and instructing posters of ads on how to best increase the impact of those ads, does not defeat § 230 immunity. "[T]he fact that a website elicits online content for profit is immaterial; the only relevant inquiry is whether the interactive service provider `creates' or `develops' that content." **Goddard v. Google,** 2008 WL 524590, *3 (N.D. Cal. Dec. 17, 2008). See also **Lycos, Inc., 478 F.3d at 419, 420-21** (holding that website operator did not become information content provider "merely because the `construct and operation' of the web site might have some influence on the content of the postings" or because website simply "provided `culpable assistance to subscribers wishing to disseminate misinformation"); **Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1124** (9th Cir. 2003) (questionnaire employed by dating service website to facilitate

creation of profiles did not transform website into information
content provider; the selection of content was left exclusively
up to posters and no profile had any content until poster created
it); **Whitney Info. Network,** 2008 WL 450095, *5 and *5 n. 14
(website operator's suggestions to posters of how to make reports
more interesting did not make it an information content provider
for purposes of § 230 immunity).

   In **MySpace, Inc.,** supra, the Fifth Circuit considered whether
§ 230 immunity barred claims by the mother and next friend of a
14-year old girl against a social network website alleging that
the website was negligent in not preventing the daughter from
lying about her
**Page 15**
age and, subsequently, being sexually assaulted by a predator.
**528 F.3d at 414.** Without the MySpace postings, the predator and
daughter would never have met and the assault would not have
happened. **Id.** at 419-20. The court held that however "artfully"
the claims had been pleaded, they were "directed toward MySpace
in its publishing, editorial, and/or screening capacities." **Id.**
at 420 (internal quotations omitted). And, "`so long as a third
party willingly provides the essential published content, the
interactive service provider receives full immunity regardless of
the specific editing or selecting process.'" **Id.** at 419 (quoting
**Carafano, 339 F.3d at 1124**).

   In the instant case, to find Backpage to be not immune from
suit based on M.A.'s allegations about how it structured its
website in order to increase its profits would be to create a
for-profit exception to § 230's broad grant of immunity. This the
Court may not do.

   M.A. further argues that Backpage should not be immune under
§ 230 because it "is aware of prior cases of minors being
sexually trafficked on its website and based upon the posted ads
and photography, no reasonable person could review the postings
in the adult categories and deny prostitution was the object of
almost each and every ad." (Pl. Mem. at 4.) The First Circuit
noted in 2007 that "[i]t is, by now, well established that notice
of the unlawful nature of the information provided is not enough
to make it the service provider's own speech." **Lycos, Inc.,
478 F.3d at 420.** "Section 230 immunity applies even after notice of
the potentially unlawful nature of the third-party content." **Id.**
See also **Zeran v. America Online, Inc., 129 F.3d 327, 333** (4th
Cir. 1997) ("Liability upon notice would defeat the dual purposes
advanced by § 230 of the CDA."); **Gregerson,** 2008 WL 451060, *9
n. 3 (finding that § 230 immunity extended to website operator even
after operator was
**Page 16**
made aware of objections to comments posted on website by third
parties). Thus, even if a service provider knows that third
parties are posting illegal content, "the service provider's
failure to intervene is immunized." **Goddard,** 2008 WL 5245490 at
*3.

   M.A. also seeks to avoid § 230's broad immunity by
characterizing Backpage as a developer of the content of
McFarland's posted ads. (See Pl. Mem. at 12-13.) This is so, she
argues, because Backpage (a) knew "that the venture in which it
voluntarily participates is a venture where it and traffickers
profit from prostitution, wherein, a substantial number of
children are being statutorily raped" and (b) knew "that a vast

number of ads are appearing on its website for prostitution and that it is doing much to maintain and improve its profitable prostitution forum." (Id. at 13.) These allegations are but another repeat of the allegations in her amended complaint that McFarland posted an ad on Backpage which led to her victimization and that Backpage, regardless of being on notice that its website might be being used for illegal purposes, did nothing to stop the ads from being posted and instead profited from such ads. As noted above, however, neither notice or profit make Backpage liable for the content and consequences of the ads posted by McFarland.

"[Section 230] does not define the term *development*." **FTC v. Accusearch, Inc., 570 F.3d 1187, 1197** (10th Cir. 2009). "The dictionary definitions for *develop* . . . revolve around the act of drawing something out, making it `visible,' `active,' or `usable.'" **Id.** at 1198 (quoting Webster's Third New International Dictionary, 618 (2002)). The question whether a website operator is a developer for purposes of § 230 then is whether "was it responsible for the development of the specific content that was the source of the alleged liability?" **Id.** "[T]o be `responsible' for the development of offensive content, one must be more than a

Page 17

neutral conduit for that content." **Id.** at 1199. "[A] service provider is `responsible' for the development of offensive content only if it in some way *specifically* encourages development of what is offensive about the content." **Id.** (emphasis added).

The sheriff who brought suit against Craigslist for allegedly facilitating prostitution by having an "adult" (formerly "erotic") section of Internet classifieds on its website cited in support of his position an advocacy group's conclusion that "`Craigslist is now the single largest source for prostitution, including child exploitation, in the country.'" **Dart, 665 F. Supp.2d at 962**. Regardless of this allegation[fn8] and the allegations that Craigslist profited from the website traffic generated by its adult-services section and that Craigslist "knowingly `arranges' meetings for the purpose of prostitution and `directs' people to places of prostitution," the court held that Craigslist was immune under § 230 unless it "created the offending ads." **Id.** at 967. It had not and could not be treated under § 230(c)(1), see page 10, supra, as having done so. **Id.** Similarly, however horrific the consequences to M.A. of McFarland's posted ads were, the ads were created by McFarland.

M.A. cites **Roommates.com, 521 F.3d at 1167-68**, and **Anthony v. Yahoo! Inc., 421 F. Supp.2d 1257** (N.D. Cal. 2006), in support of her argument that Backpage is a developer of the objectionable ad. Her reliance on these cases is unavailing.

The Ninth Circuit, sitting en banc, held that Roommates.com was the "information content provider" for the profiles of subscribers to its website to match people needing a

Page 18

place to live with people having rooms to rent. **Roommates.com, 521 F.3d at 1164**. This was so because it had developed "at least `in part'" the information in the profiles. **Id.** at 1165. This information allegedly violated federal and state housing discrimination laws by *requiring* subscribers to include discriminatory criteria in their profiles. **Id.** at 1161-62, 1166, 1167. "By requiring subscribers to provide the [discriminatory]

information as a condition of accessing its service, and by
providing a limited set of pre-populated answers, Roommate
becomes much more than a passive transmitter of information
provided by others; it becomes the developer, at least in part,
of that information." **Id.** at 1166. This active control of the
content of the objectionable postings was what caused Roommates
to be described as a developer.**[fn9]** See **Id.** at 1166, 1169, 1170
n. 24, 1172. Indeed, the portion of the decision immediately
preceding the portion quoted by M.A. makes it evident how
important this control was to the court's conclusion.

> *It's true that the broadest sense of the term "develop"*
> *could include the functions of an ordinary search*
> *engine — indeed, just about any function performed by*
> *a website. But to read the term so broadly would defeat*
> *the purposes of section 230 by swallowing up every bit*
> *of the immunity that the section otherwise provides.* At
> the same time, reading the exception for co-developers
> as applying only to content that originates entirely
> with the website . . . ignores the words
> "development . . . in part" in the statutory passage
> "creation *or development* in whole *or in part.*"
> **47 U.S.C. § 230**(f)(3) (emphasis added).

**Id.** at 1167 (first emphasis added).
**Page 19**

   Similarly, in **Anthony,** supra, the court held that Yahoo! was
not immune under § 230 from claims that it *created* false profiles
to lure users into renewing their subscriptions.
**421 F. Supp.2d at 1262-63.[fn10]** And, in **FTC,** **570 F.3d at 1201,** the website operato
was found to have developed the objectionable content —
confidential personal data — by soliciting requests for
confidential information protected by law, paying researchers to
find it, while knowing that the researchers were likely to use
improper methods, and charging customers for the information.

   In the instant case, there is no allegation that Backpage was
responsible for the development of any portion of the *content* of
McFarland's posted ads or specifically encouraged the development
of the offensive nature of that content.**[fn11]** See **Ben Ezra,**
**Weinstein and Co. v. America Online, Inc.,** **206 F.3d 980,** **985**
(10th Cir. 2000) (holding that interactive computer service did
not "develop" allegedly inaccurate information about plaintiff's
stock merely by communicating with providers of information and
by deleting some information).

   Rhetorically asking "should a website that solicits and
facilitates illegal conducted be protected under the guise of a
free internet," M.A. contends that the application of § 230
**Page 20**
immunity to Backpage is "indefensible." (Pl. Mem. at 6.) The
court in the defamation suit of **Patent Wizard, Inc. v. Kinko's,**
**Inc.,** **163 F. Supp.2d 1069** (D. S.D. 2001), summarized the conflict
in a case involving § 230 immunity between facilitating growth of
the Internet and preventing harm to individuals.

> [T]his case implicates some important issues of policy.
> On the one hand, the ability of individual users to log
> onto the Internet anonymously, undeterred by
> traditional social and legal restraints, tends to

promote the kind of unrestrained, robust communication
that many people view as the Internet's most important
contribution to society. On the other hand, the ability
of members of the public to link an individual's online
identity to his or her physical self is essential to
preventing the Internet's exchange of ideas from
causing harm in the real world.

The legislative resolution of these issues will,
indirectly, shape the content of communication over the
Internet. For now, the § 230 of the [CDA] errs on the
side of robust communication, and prevents the
plaintiffs from moving forward with their claims.

**Id.** at 1071-72 (internal citation omitted). Also, the court in
**Blumenthal, 992 F. Supp. at 51**, seemingly agreed with M.A.'s
dismay with the scope of immunity, but nonetheless found it to be
within Congress' charge to change. Finding that § 230 immunity
applied to defamation claims brought against America Online (AOL)
for content posted on AOL by its gossip columnist, the court
noted that AOL had certain editorial rights with respect to the
content provided by the columnist and disseminated by AOL, had
promoted the columnist, and yet took no responsibility for any
damage he caused. **Id.** "AOL is not a passive conduit like the
telephone company, a common carrier with no control and therefore
no responsibility for what is said over the telephone wires.
Because it has the right to exercise editorial control over those
with whom it contracts and whose words it disseminates, it would
seem only fair to hold AOL to the liability standards applied to
a publisher or, at least, like a book store
**Page 21**
owner or library, to the liability standards applied to a
distributor. But Congress has made a different policy choice by
providing immunity even where the interactive service provider
has an active, even aggressive role in making available content
prepared by others." **Id.** at 51-52 (footnotes omitted).

Thus, regardless of M.A.'s characterization of the policy
choice of denying § 230 immunity in such circumstances as alleged
as "clear," it nonetheless is a matter Congress has spoken on and
is for Congress, not this Court, to revisit.

**18 U.S.C. § 2255.** M.A. seeks to hold Backpage liable under
§ 2255, see note 2, supra, not as a publisher of the content of
McFarland's ads but "as an aider and abettor of minor sex
trafficking by virtue of [its] above culpable conduct." (Pl. Mem.
at 5.) In support of this position, M.A. cites **Doe v. Liberatore,
478 F. Supp.2d 742** (M.D. Pa. 2007). The question in that case was
whether a diocese, church, bishop, and priest who had known of
sexual abuse of a boy by another priest could be held liable
under § 2255 to that boy. The court rejected the defendants'
argument that only the abuser-priest could be held liable under
§ 2255 because only he violated the statutes listed in § 2255, **[fn12]**
holding that "if one has aided or abetted another in violating
one of the [listed] statutes . . ., then he himself has committed
an act indictable under that listed statute." **Id.** at 756. The
court also rejected the plaintiff's argument that the defendants
could be held liable for aiding and abetting, finding that the
**Page 22**
statute, **18 U.S.C. § 2**, "requires that one acted with the intent
to help those involved with a *certain* crime." **Id.** (internal
quotations omitted).

Title **18 U.S.C. § 2** provides:

(a) Whoever commits an offense against the
United States or aids, abets, counsels, commands, induces or
procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if
directly performed by him or another would be an
offense against the United States, is punishable as a
principal.

"Liability under [§ 2] requires the government to prove that a
defendant associated himself with and participated in an unlawful
venture in a way that shows he wished to bring it about, and that
he acted to make the venture succeed." **United States v. Devries,
630 F.3d 1130, 1133** (8th Cir. 2011).

The court in **Liberatore,** supra, held that the plaintiff had not
shown that the defendants "consciously shared [the abuser's]
knowledge of the underlying substantive offenses, as well as the
specific criminal intent to commit them." **478 F. Supp.2d at 756.**
"While it is possible to infer knowledge from a combination of
suspicion and indifference to the truth, there still remains no
evidence even remotely suggesting that the [defendants] shared
[the abuser's] *specific* intent to commit the sexual offenses."
**Id.** at 756-57 (emphasis added).

As noted above, in considering a Rule 12(b)(6) motion, "the
complaint should be read as a whole, not parsed piece by piece to
determine whether each allegation, in isolation, is plausible."
**Braden, 588 F.3d at 594**. Reading M.A.'s amended complaint as a
whole, her allegations of Backpage aiding and abetting McFarland
do not describe the specific intent
**Page 23**
required for aiding and abetting under § 2. Rather, those
allegations describe only a violation of § 2255 by "the creation
and maintenance of [a] highly effective internet tool. . . ."
(Pl. Mem. at 5.) In **Dart, 665 F. Supp.2d at 967**, the court held
that Craigslist could not be held liable for facilitating
prostitution and child exploitation under an "aiding and
abetting" theory based on the misuse of its services by its
customers. See also **Doe v. GTE Corp., 347 F.3d 655, 661** (7th Cir.
2003) (rejecting claim against internet service provider for
customer's use of website to post images of plaintiff athletes
who were unknowingly recorded unclothed; although provider
enabled customer to post objectionable content, this did not
defeat § 230 immunity); **Goddard,** 2008 WL 5245290 at *7 (finding
that plaintiff's attempt to hold website liable under aiding and
abetting theory was "simply inconsistent with § 230").

M.A. further argues that § 230's immunity does not apply to her
§ 2255 action because § 230(e)(1) specifically provides that it
has no effect on criminal laws and is not to be construed to
"impair the enforcement of, as relevant, chapter 110 of Title 18,
or any other Federal criminal statute." **47 U.S.C. § 230**(e)(1). In
her count brought pursuant to § 2255, M.A. seeks an award of
damages, attorney's fees, and costs. (Am. Compl. at 6.) These
remedies are available under § 2255, titled *"Civil* remedy for
personal injuries." **18 U.S.C. § 2255** (emphasis added).

"Criminal law" is "[t]he body of law defining offenses against

the community at large, regulating how suspects are investigated, charged, and tried. . . ." Black's Law Dictionary, 431 (9th ed. 2009). Civil law is "[t]he law of civil or private rights, as opposed to criminal law or administrative law." Id. at 280. "The difference between civil law . . . and criminal

**Page 24**

law turns on the difference between two different objects which the law seeks to pursue — redress or punishment. The object of civil law is the redress of wrongs by compelling compensation or restitution. . . . [I]n the case of crimes, the main object of the law is to punish the wrongdoer . . ." Id.

In **Doe v. Bates,** 2006 WL 3813758 (E.D. Tex. Dec. 27, 2006), the court held Yahoo! was immune under § 230 in a suit brought against it under § 2255 on allegations that it knowingly hosted child pornography, including sexually explicit photographs of the plaintiff's minor son. As does M.A., the plaintiffs argued that Yahoo! should be held liable because "it knowingly profited from trafficking of illegal child pornography" and "did nothing to prevent, remove, or block the illegal child pornographic material from being stored on its web site or its servers. . . ." **Id.** at *3, 6. Also sued was the man who had been convicted under **18 U.S.C. § 2252A** for interstate distribution of child pornography. **Id.** at *6. M.A. argues that Backpage is liable under § 2255 because it is "the river through which internet sexual trafficking flows." (Pl. Mem. at 5.) In **Bates,** the plaintiffs alleged that Yahoo! "`created, hosted and maintained the *portal through which* thousands of pedophiles prospered and hundreds of children, including Johnny Doe, were victimized. . . ." **Bates,** 2006 WL 3813758 at *15 (emphasis in citing source). M.A. argues that Backpage was a participant; plaintiffs in **Bates** did also. **Id.** As in the instant case, however, the *content* of what was posted on Yahoo!'s website was provided by another. **Id.** at *16. In **Bates,** it was pornographic pictures of a minor child; in this case, it was pornographic pictures of a minor child. Similarly to the policy arguments advanced by M.A., the **Bates** "Plaintiffs' invocation of Section 230(e)(1) rests on their generalized policy arguments rather than the text of the

**Page 25**

statute. Plaintiffs' core argument appears to be that Section 230(e)(1) must exempt civil claims under the child pornography statutes because child pornography is `not to be tolerated' and `[i]f the prospect of civil liability provides a disincentive for engaging in child pornography over and above that provided by the prospect of fines and jail time, then that is a good thing.'" **Id.** at * 22. Adopting the magistrate judge's report and recommendation that the claims against Yahoo! be dismissed, the district court held that Yahoo! was immune under § 230 from the § 2255 action. **Id.** at 5. "While the facts of a child pornography case such as this one may be highly offensive, Congress has decided that the parties to be punished and deterred are not the internet service providers but rather are those who created and posted the illegal material, such as convicted Mark Bates, the moderator of the [child pornography] e-group." **Id.** at *4.

M.A. characterizes the **Bates** holding as flawed and argues it should not be followed. (Pl. Mem. at 9.) The holding is supported, however, by other cases applying the broad reach of § 230's immunity to websites that, whatever they did to increase their profitability and visibility, did not create the content of the offensive posted information. As with the plaintiffs in **Bates,** this does not lead M.A. without a remedy under § 2255. She

may still pursue a civil remedy against McFarland.

**18 U.S.C. § 1595.** M.A. next argues that she has a cause of action under § 1595 against Backpage and need not prove aiding and abetting because § 1595 has "its own culpability mens rea standard." (Pl. Mem. at 6.) Assuming, without deciding, that M.A.'s characterization of the statute is correct, for the reasons set forth above in the discussion on § 2255, Backpage remains immune under § 230 from her claims.
**Page 26**

Optional Protocol. M.A. also argues that the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography**[fn13]** (hereinafter Optional Protocol), S. Treaty Doc. No. 106-37, 2000 WL 33366017 (entered into force Jan. 18, 2002), and the primary rights it creates takes precedence over § 230's immunity provision. (Am. Compl. ¶ 5.) Backpage disagrees.

The Optional Protocol requires that, inter alia, "[e]ach State Party shall ensure that, as a minimum, the following acts and activities are fully covered under its criminal or penal law, . . .: (a) In the context of the sale of children as defined in Article 2; (b) Offering, obtaining, procuring or providing a child for child prostitution as defined in Article 2. . . ." Optional Protocol, supra, 2000 WL 33366017 at *8. Article 2 defines sale of children as "any act or transaction whereby a child is transferred by any person or group of persons to another for remuneration or any other consideration." Id. Child prostitution is defined as "the use of a child in sexual activities for remuneration or any other form of consideration. . . ." Id. Article 9 reads, in relevant part:

> 1. States Parties shall adopt or strengthen, implement and disseminate laws, administrative measures, social policies and programmes to prevent the offences referred to in the present Protocol.

>                                  . . .

> 4. State Parties shall ensure that all child victims of the offenses described in the present Protocol have access to adequate procedures to seek,
**Page 27**
without discrimination, compensation for damages from those legally responsible.

> 5. State Parties shall take appropriate measures aimed at effectively prohibiting the production and dissemination of material advertising the offenses described in the present Protocol.

Id. at *11. The analysis by the Department of State that accompanied the transmittal of the Optional Protocol to the Senate for its advice and consent to ratification concluded that the United States met the requirements of Article 9. **[fn14]** Id. at *1, 30. Specifically, "[w]ith respect to Article[] 9(1) . . ., it is a priority commitment for the United States at both the federal and state levels to strengthen and implement laws to prevent the offenses prohibited by the Protocol." Id. "With regard to the requirements of Article 9(4), . . . there is mandatory restitution for victims in these cases under federal law." Id. at

*31. "Consistent with the provisions of Article 9(5), U.S. law contains certain restrictions on advertising that are appropriate under our legal system. For example, **18 U.S.C. § 2251** proscribes advertising child pornography when the child pornography actually exists for sale or distribution." Id.

   When the Senate ratified the Optional Protocol, it did so subject to, inter alia, declarations that "the provisions of the Protocol (other than Article 5**[fn15]**) are non-self executing," "current United States law . . . fulfills the obligations of the Protocol for the United States; and, . . . accordingly, the United States does not intend to enact new legislation to fulfill its obligations under the Protocol." Convention on the Rights of the

**Page 28**

Child on the Sale of Children, Child Prostitution and Child Pornography — Treaty Document No. 106-37B, 148 Cong. Rec. S5717-01, 2002 WL 1332171 (June 18, 2002).

   "Th[e] [Supreme] Court has long recognized the distinction between treaties that automatically have effect as domestic law, and those that — while they constitute international law commitments — do not by themselves function as binding federal law." **Medellin v. Texas, 128 S.Ct. 1346, 1356** (2008). "[A] treaty is equivalent to an act of the legislators, and hence self-executing, when it operates of itself without the aid of any legislative provision." Id. (internal quotations omitted). "[W]hile treaties may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be `self-executing' and is ratified on these terms." Id. (second alteration in original); accord **Raffington v. Cangemi, 399 F.3d 900, 903** (8th Cir. 2005). Moreover, "[e]ven when treaties are self-executing in the sense that they create federal law, the background presumption is that [i]nternational agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." **Medellin, 128 S.Ct. at 1356** (internal quotations omitted) (second alteration in original). See also **Katel L.L.C. v. AT & T Corp., 607 F.3d 60, 67** (2nd Cir. 2010) (noting that "[t]here is a presumption that treaties do not create privately enforceable rights in the absence of express language to the contrary") (internal quotations omitted); accord **Gross v. German Foundation Industrial Initiative, 549 F.3d 605, 615** (3rd Cir. 2008); **Renkel v. United States, 456 F.3d 640, 643** (6th Cir. 2006)

   Clearly, the Optional Protocol is not self-executing; indeed, the Senate has declared it not to be. "For a non-self-executing treaty, any private claim must be based on a violation

**Page 29**

of the domestic law implementing the provisions of that treaty." **Renkel, 456 F.3d at 643** (finding no private right of action pursuant to a treaty that the United States Senate declared to be not self-executing when ratifying it) (citing Raffington, **399 F.3d at 903**). In the instant case, the Senate expressly declared when ratifying the Optional Protocol that its obligations under the Protocol were fulfilled by existing law and no new legislation was intended.**[fn16]** Existing law includes statutes making child prostitution and peonage a felony, statutes providing for a private right of action for violations of that law, and a statute immunizing internet service providers from suits arising from the

content of postings on the internet. This latter statute, § 230, does not make the other statutes chimerical. People, McFarland, for instance, may be prosecuted for child prostitution or child peonage. Victims, M.A., for instance, may bring a private right of action against McFarland or any other provider of the content of the postings which led to her victimization for subjecting her to child prostitution and child peonage.

Plaintiff's contention that "[a]ny claim that treaties are not judicially enforceable unless the treaty creates therein a domestic remedial rights [sic] is contrary to two centuries of jurisprudence" is answered by the Supreme Court's decision in **Medellin,** supra, also focusing on an optional protocol. The protocol at issue did, as here, provide that it was non-self-executing. The Court held that "the terms of a non-self-executing treaty can become domestic law only in the same way as any other law — through passage of legislation by both

**Page 30**

Houses of Congress, combined with either the President's signature or a congressional override of a Presidential veto." **128 S.Ct. at 1369.** When the Senate ratified the Optional Protocol, existing legislation included § 230.

Seemingly recognizing this quandary, Plaintiff asks the Court to hold that the treaty prevents the application of § 230 "in these limited circumstances." (Pl. Mem. at 24.) However sympathetic the Court might be to M.A.'s situation, the Court cannot ignore the Senate's language when ratifying the Optional Protocol or disregard the Supreme Court's jurisprudence on non-self-executing treaties.

The Court also finds M.A.'s arguments that, under the Administrative Procedure Act, **5 U.S.C. § 701** et seq. (APA), and the Charming Betsey doctrine unavailing.

The APA provides for judicial review of a "legal wrong" or adverse affect suffered by a person "because of *agency* action. . . ." **5 U.S.C. § 702** (emphasis added). "`[A]gency means each authority of the Government of the United States . . ." with certain exceptions not applicable to the instant case. **5 U.S.C. § 701**(b)(1). "The APA is not an independent jurisdictional provision," but "is a procedural statute that . . . merely provides the framework for judicial review of *agency* action." **Ochoa v. Holder, 604 F.3d 546, 549** (8th Cir. 2010) (emphasis added). Because Backpage is not an agency, M.A. may not seek judicial review under the APA of any action or inaction by Backpage.

M.A. correctly notes that under **Murray v. The Schooner Charming Betsey, 6 U.S. (2 Cranch) 64**, 118 (1804), "an act of Congress ought to never to be construed to violate the laws of nations if any other possible construction remains. . . ." M.A. overlooks, however,

**Page 31**

the terms on which the Senate ratified the Optional Protocol. As discussed above, those terms fatally undermines her reliance on the Charming Betsey doctrine.

## Conclusion

Plaintiff artfully and eloquently attempts to phrase her

allegations to avoid the reach of § 230. Those allegations, however, do not distinguish the complained-of actions of Backpage from any other website that posted content that led to an innocent person's injury. Congress has declared such websites to be immune from suits arising from such injuries. It is for Congress to change the policy that gave rise to such immunity. See **Defenders of Wildlife, Friends of Animals and Their Environment v. Hodel, 851 F.2d 1035, 1039** (8th Cir. 1988) (holding that "a court will not decide `abstract questions of wide public significance' most appropriately addressed by the legislature") (quoting Warth v. Seldin, **422 U.S. 490, 500** (1975)).

Accordingly,

**IT IS HEREBY ORDERED** that the motion to dismiss of Village Voice Media Holdings, LLC, and Backpage.com, LLC is **GRANTED**. [Doc. 27]

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

[fn1] The case is before the undersigned United States Magistrate Judge by written consent of the parties. See **28 U.S.C. § 636**(c).


[fn2] Section 2255 provides, in relevant part:

(a) **In general.** — Any person who, while a minor, was a victim of a violation of section 2241(c), 2242, 2243, 2251A, 2252A, 2260, 2421, 2422, or 2423 of this title and who suffers personal injury as a result of such violation . . . may sue in any appropriate United States District Court and shall recover the actual damages such person sustains and the cost of the suit, including a reasonable attorney's fees.


[fn3] The paragraph following paragraph number 17 is mistakenly labeled number 16. The numbering of subsequent paragraphs builds on this error. For instance, a second paragraph 17 follows the mislabeled 16; this paragraph 17 is followed by 18 and so forth. For ease of reference, the Court will cite the true number of the paragraph and indicate such by including that number in brackets.


[fn4] Section 1595(a) provides that:

An individual who is a victim of a violation may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

The chapter is Chapter 77 — Peonage and Slavery and includes statutes prohibiting enticement into slavery, § 1583, and forced labor, § 1589, and trafficking with respect to involuntary servitude and forced labor, § 1590.

[fn5] "Post" is defined in the Internet context as "[t]o upload or input information that will be stored (either temporarily or permanently) on a website . . . or elsewhere online." 4 Ian C. Balloon, <u>E-Commerce & Internet Law,</u> Glossary at 40 (2011) (<u>E-Commerce</u>).

[fn6] "A website is an electronic location on the World Wide Web that may contain text, graphics, visual images or sound." <u>Id.</u> at 60. "A website has also been defined as 'an Internet address that permits the exchange of information with a host computer.'" <u>Id.</u> (quoting <u>Zippo Mfg. Co. v. Zippo Dot Com, Inc.,</u> 952 F. Supp. 119, 1121 n. 2 (W.D. Pa. 1997)).

[fn7] "In the online context, 'posting' refers to providing material that can be viewed by other users, such as one 'posts' notices on a physical bulletin board." **<u>Fair Housing Council of San Fernando Valley v. Roommates.com, 521 F.3d 1157, 1161</u>** n. 3 (9th Cir. 2008) (en banc)).

[fn8] Similarly, Plaintiff has submitted a letter to Backpage from the Attorney Generals of 21 states, including Missouri, asking that the adult sections portion of its website be taken down. The Court need not decide whether this letter may be considered on a Rule 12(b)(6) motion to dismiss because it is irrelevant for purposes of § 230 immunity.

[fn9] <u>Cf.</u> **<u>Carafano, 339 F.3d at 1124</u>** (holding that website's use of questionnaire to facilitate express of information by users while leaving selection of content up to users, its classification of user characteristics into discrete categories, and its collection of responses to specific essay questions did not transform website "into a 'developer' of the 'underlying misinformation'").

[fn10] The court also held that Yahoo! was not immune from allegations that it "sent 'profiles of actual, legitimate former subscribers whose subscriptions had expired and who were no longer members of the service to current members of the service'" to lure those members into renewing their subscriptions. **<u>421 F. Supp.2d at 1263</u>**. "Because Anthony posits that Yahoo!s manner of presenting the profiles — not the underlying profiles themselves — constitute [sic] fraud, the CDA does not apply." **<u>Id.</u>** M.A.'s allegations of how Backpage operates its website, however, describe the ordinary functions of by websites.

[fn11] Indeed, the Court notes that M.A. argues at one point that Backpage is not being sued for the content of the ads.

[fn12] <u>See</u> note 2, supra. At least one court has held that a criminal conviction for one of the listed statutes is not a prerequisite to a § 2255 action. See **<u>Smith v. Husband, 376 F. Supp.2d 603, 612</u>** (E.D. Va. 2005).

[fn13] An "optional protocol" is "[a]n international legal instrument that modifies or amends an international human rights treaty, such as by adding other human rights or adding a new way of implementing the treaty rights." Victor H. Condé, 1 <u>Human Righs in the United States: A Dictionary and Documents</u> 195 (2nd ed. 2011). "Because a protocol is itself an international legal instrument, it must go through all the formalities of a treaty." <u>Id.</u>

[fn14] <u>See</u> **<u>United States v. Frank,</u>** <u>486 F. Supp.2d 1353,</u> <u>1358</u> (S.D. Fla. 2007) (noting that such an analysis is a form of legislative history).

[fn15] Article 5 concerns extradition.

[fn16] Plaintiff argues that the government must have believed the Optional Protocol's primary rights to be self-executing insofar as no additional implementing legislation was required. (Pl. Mem. at 19.) This argument brushes aside the express statement on ratification that the Optional Protocol was *not* self-executing. Implementing legislation was therefore required; but, *existing* legislation was sufficient.

---

Copyright © Copyright © 2011 CCH Incorporated or its affiliates

11/15/2011 10:07 AM

# Loislaw Federal District Court Opinions

DOE v. LIBERATORE (M.D.Pa. 2007)

478 F. Supp.2d 742

John DOE, Plaintiff, v. Rev. Albert M. LIBERATORE, Jr., Diocese of Scranton

Sacred Heart of Jesus Church, Bishop James C. Timlin, Rev. Joseph R. Kopacz

and Brother Antonio F. Antonucci, Defendants.

Civil Action No. 3:04-CV-2427.

United States District Court, M.D. Pennsylvania.

March 19, 2007.

**West Page 743**

[EDITORS' NOTE:  THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
**West Page 744**

[EDITORS' NOTE:  THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
**West Page 745**

[EDITORS' NOTE:  THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.]
**West Page 746**

Daniel T. Brier, Donna A. Walsh, Myers Brier & Kelly, LLP, Scranton, PA, for Plaintiff.

Lawrence J. Moran, Abrahamsen, Moran & Conaboy, P.C., Stephanie L. Austria, James E. O'Brien, Jr., Kennedy, O'Brien, McCormack & Mulcahey, Christopher J. Osborne, Powell Law, Scranton, PA, Karoline Mehalchick, Joseph A. O'Brien, Oliver, Price & Rhodes, Clarks Summit, PA, for Defendants.

## MEMORANDUM

CAPUTO, District Judge.

Presently before the Court are Defendants Diocese of Scranton (the "Diocese"), Sacred Heart of Jesus Church ("Sacred Heart"), Bishop James C. Timlin ("Bishop Timlin"), Rev. Joseph R. Kopacz ("Father Kopacz") (collectively the "Diocesan Defendants") and Brother Antonio F. Antonucci's ("Brother Antonucci") (collectively "Defendants") motions for summary judgment (Docs. 75-1, 76) as to Counts I, III, IV, V, VI, VII and VIII of Plaintiff John Doe's Complaint (Doc. 1). The Diocesan Defendants also seek summary judgment as to Plaintiff's claim for punitive damages. For the reasons stated below, the Court will grant in part and deny in part Defendants' motions. The Court has jurisdiction over this matter pursuant to **28 U.S.C. §§ 1331** and **1367**(a).

West Page 747
Page 2

**BACKGROUND**

## I. Factual History

### A. Defendant Rev. Albert M. Liberatore and Richard Roe

Defendant Rev. Albert M. Liberatore ("Liberatore") was ordained as a priest in the Diocese by Bishop Timlin on August 26, 1989. (Curriculum Vitae of Rev. Albert M. Liberatore, Doc. 88-2 p. 5, "Liberatore CV.") Following several years of study at the Catholic University of Louvain, in Leuven, Belgium, towards obtaining a Ph.D. in Theology, Liberatore returned to Scranton and, in June of 1995, was assigned by Bishop Timlin to serve as Vocations Director of the Diocese. (Bishop James C. Timlin Dep. 168:2-5, Sept. 22, 2006, Docs. 88-5, 88-6; Liberatore CV at 2.) Liberatore took up residence at St. Pius X Seminary (the "Seminary") in Dalton, Pennsylvania. (Liberatore CV at 2.) Liberatore also taught classes at the University of Scranton as a non-resident faculty member. (Liberatore CV at 2; Richard Roe Dep. 11:18-19, Sept. 5, 2006, Doc. 88-4.)

In the fall of 1995, Liberatore befriended Richard Roe ("Roe"), a twenty-one (21) year old male student in the Sacramental Theology class which he taught at the University of Scranton.**[fn1]** (Roe Dep. 11:17-14:18.) Later that semester, Liberatore wrote Roe a letter inquiring as to whether Roe was interested in discerning whether he had a calling for the priesthood. (Roe Dep. 12:1-22.) Roe, in fact, was interested, and, thereafter, he and Liberatore began spending a great deal of time together. (Roe Dep.
**Page 3**
15:2-18:22.) Liberatore took Roe out to dinner, purchased gifts for him, and took him to New York City on multiple occasions. (*Id.*)

In the spring of 1996, Liberatore encouraged Roe, then a college senior and near graduation, to pursue a full-time position as the Director of Youth and Young Adult Retreats for the Diocese. (Roe Dep. 20:9-11.) This position would require Roe to have an office at the Seminary, where Liberatore resided. (Roe Dep. 21:10-12.) Roe was hired for the position, thanks in part to Liberatore's recommendation. (Roe Dep. 21:14-18.)

After Roe graduated from the University of Scranton, Liberatore took him to Los Angeles, California, as a graduation gift. (Roe Dep. 23:1-15.) The night before Liberatore and Roe were to fly to Los Angeles they went out to several bars to drink. (Roe Dep. 24:1-6.) On the way home, Liberatore and Roe sat in the back seat of a car driven by one of Liberatore's friends. (Roe Dep. 24:8-17.) During the drive, Liberatore "leaned on [Roe] and put his hand on [Roe's] thigh." (Roe Dep. 24:20-22.) Roe construed this as a sexual overture. (Roe Dep. 27:17.)

Despite the sexual overture on the part of Liberatore, for much of the summer of 1996, Roe stayed in Liberatore's bedroom at the Seminary while he looked for an apartment. (Roe Dep. 29:1-6; 33:1.) After Roe had found an apartment, he oftentimes stayed overnight in Liberatore's bedroom at the Seminary. (Roe Dep. 32:16-33:1.) This state of affairs was not kept secret from the

other seminarians. (Roe Dep. 33:5-8.) Liberatore would also
oftentimes fail to return to the Seminary and instead stay
overnight at Roe's apartment. (Roe Dep. 46:1-4.) Near the end of
the summer of 1996, Liberatore began having discussions with Roe
about sexuality, particularly in regard to what had transpired in
the car on the way home from
**West Page 748**
the night of drinking. (Roe Dep. 19:14-22;
**Page 4**
27:2-18.)

During the fall of 1996, Liberatore took Roe and another
seminarian, Michael Moe ("Moe"), who was then nineteen (19) years
of age, to New York City for dinner and drinks. (Roe Dep.
29:19-31:7; Decl. of Michael Moe ¶ 15, Sept. 14, 2006, Doc.
88-8.) The three of them then stayed the night in a hotel suite.
(Roe Dep. 30:18-31:1.) While Moe slept on the couch, Liberatore
and Roe slept in the lone bed. (Roe Dep. 31:14-16.)

This incident was called to the attention of Bishop Timlin by
Father Bambera, who, in November of 1996, wrote a memo to Bishop
Timlin expressing "serious concerns . . . regarding questionable
behavior of Father Al Liberatore." (Memo from Father Bambera to
Bishop Timlin, dated November 27, 1996, Doc. 80-7, "Bambera
Memo".) Father Bambera described this incident as one of "grave
concern." (*Id.*) Father Bambera also informed Bishop Timlin of the
"evolution of [the] relationship" between Liberatore and Roe,
which he stated had "become very obvious to the seminarians as
well." (*Id.*) While Father Bambera opined that he did not feel
there was anything improper about the relationship, he related to
Bishop Timlin that Liberatore and Roe spent "an inordinate amount
of time" together, that Roe was "often in [Liberatore's] rooms
until late at night, and that Roe "often becomes the focus of
[Liberatore's] attention at seminary gatherings." (*Id.*) Father
Bambera also noted that he had informed others in the Diocese,
namely Monsignor David Bohr, Bishop Dougherty, Monsignor John
Esseff and Monsignor Dale Rupert, of the relationship between
Liberatore and Roe. (*Id.*)

On an evening in the fall of 1996, Liberatore and Roe were
watching a movie in Liberatore's room at the Seminary. (Roe Dep.
39:1-22.) Roe was lying on the couch while Liberatore was lying
on the floor near the couch. (*Id.*) After the movie, Liberatore
**Page 5**
tried to touch Roe in a sexually explicit manner. (Roe Dep.
46:12-18.) Liberatore then began to discuss sexuality —
homosexuality in particular — with Roe. (Roe Dep. 43:8-12.)
During this conversation, Liberatore encouraged Roe to engage in
homosexual relations with him. (Roe Dep. 43:11-44:10.) Liberatore
also discussed with Roe the homosexual activity that Liberatore
had engaged in with others, including describing in detail what
homosexual acts he had performed. (Roe Dep. 44:17-22.) In fact,
Liberatore described homosexual acts in which he had engaged
while living in the Seminary. (Roe Dep. 44:20-22.)

In the early part of 1997, Liberatore and Roe took a trip to
Philadelphia. (Roe Dep. 50:10-13.) After spending the evening at
Dave & Buster's, a bar and arcade, Liberatore and Roe stayed the
night in a hotel room. (Roe Dep. 53:16-22.) During the night,
Liberatore "got out of his bed and got into [Roe's] bed and laid
down next to [Roe] and put his arm around [Roe], and at some

point during the night [Liberatore] put his hand down [Roe's] pants." (*Id.*)

Roe related other incidents in which Liberatore made unwanted sexual contact with him, including one instance when Roe awakened to find Liberatore's penis in his hand. (Roe Dep. 69:6-7.)

Another incident, occurring during the spring of 1997, began at dinner when Liberatore maneuvered his foot into Roe's crotch while they were at a restaurant. (Roe Dep. 56:20-57:2.) After dinner, Liberatore invited Roe back to spend the night in his bedroom at the Seminary. (Roe Dep. 57:16-18.) While speaking in the sitting room before heading to bed, Liberatore expressed his displeasure in Roe's attraction to a young woman whom

**West Page 749**

he knew. (Roe Dep 47:14-48:15; 58:2-7.) Roe then "got pretty

**Page 6**

emotional" and started to cry. (Roe Dep. 58:7-9.) Roe then tried to leave Liberatore's room, but Liberatore physically blocked his attempt. (Roe Dep. 59:2-4.) Roe then tried to throw Liberatore out of the way. (Roe Dep. 59:9.) Pushing and shoving ensued, and Liberatore ended up falling on the ground. (Roe Dep. 59:10-11.) This altercation awakened many, if not all, of the seminarians and faculty. (Letter from Roe to The Seminarians of St. Pius X Seminary, dated April 5, 1997, Doc. 80-8, "Roe Letter.") One seminarian, Reverend Thomas Muldowney ("Father Muldowney"), even came to Liberatore's room to help calm Roe down. (Roe Dep. 59:12-13.) Father Muldowney stated in his deposition that Roe, appearing very upset, yelled, "I'm a twenty-two (22) year old fucking homosexual." (Reverend Thomas Muldowney Dep. 46:1-4, Dec. 8, 2005, Doc. 88-8 p. 16 of 26.) Father Muldowney stated that several other seminarians heard the commotion and came to the room. (Muldowney Dep. 46:5-11.) Father Muldowney reported the incident to Monsignor Bohr, the Rector at the Seminary, who, in turn, contacted Bishop Timlin to inform him of it. (Monsignor David Bohr Dep. 42:8-43:11, Jan. 3, 2006, Doc. 82-2.) Eventually Roe was calmed down and then fell asleep in Liberatore's room. (Roe Dep. 60:1-3.) When Roe woke up the next morning, he found that he was in Liberatore's bed with Liberatore in bed next to him. (Roe Dep. 60:4-6.) Liberatore's hand was down Roe's pants and was touching Roe's penis. (Roe Dep. 60:7.) Liberatore then attempted to perform oral sex on Roe. (Roe Dep. 61:2-3.) At that point, the bell for morning prayer rang, and Roe was able to extricate himself from the situation. (Roe Dep. 60:12-18.)

A few days later, Roe told Monsignor Rupert that he had been sleeping in Liberatore's bedroom, in Liberatore's bed. (Roe Dep. 62:20-63:3.) Roe also informed Monsignor Rupert that Liberatore had made several attempts to have homosexual contact with Roe. (Roe Dep. 63:12-15.) Roe had many conversations with Monsignor

**Page 7**

Rupert regarding his relationship with Liberatore. (Roe Dep. 63:9-10.)

In March of 1997, Bishop Timlin was informed of an incident involving Liberatore and one of the male seminarians. (Summary of Concerns Regarding Fr. Liberatore, dated March 1997, Doc. 88-8, "Summary".) During the Seminary, on February 24, 1997, twenty (20) boys from Bishop Hoban High School "passed by the open door to Peter Poe's room in which Fr. Al [Liberatore] was seen lying on Peter's bed and being given a back massage by

Peter." (Summary at 2.) Bishop Timlin was also informed of Liberatore's "close relationships" with several of the seminarians, including Michael Moe. (Summary at 1.)

   After the altercation between Liberatore and Roe and the back massage with Poe, Bishop Timlin removed Liberatore from the Seminary and reassigned him to St. Clare's Parish in Dunmore, Pennsylvania. (Bohr Dep. 44:8-9; 68:21-69:4; *See* Roe Letter at 3.) In July of 1997, Liberatore was reassigned again, this time to Sacred Heart, located in Duryea, Pennsylvania. (*See* Doc. 1-1 ¶ 11.) Shortly thereafter, Liberatore was named the Pastor of Sacred Heart. (*See id.*)

   **B. Liberatore and Plaintiff**

   Plaintiff was a parishioner and alter server of Sacred Heart. (Moe Decl. ¶ 20.) In 1999, Liberatore, as Pastor of Sacred Heart, hired Plaintiff, who was then fourteen (14) years of age, to work at Sacred Heart as a sacristan. (*See* Doc. 1-1 ¶ 14; Patricia Minora Dep. 13:1-6, Jan. 26, 2006, Doc. 89-2.) Over the course of the next year, Liberatore "groomed" Plaintiff (Pl.'s
**West Page 750**
Dep. 166:4-7, Oct. 17, 2006, Doc. 89-3 p. 13) — that is, Liberatore undertook to establish an intimate friendship with Plaintiff in preparation to the eventual introduction of sexual activity. Wikipedia, The Free Encyclopedia, "Child Grooming", http://en.wikipedia.org/wiki/Child_grooming (last visited March 15, 2007).
**Page 8**
During this time, Liberatore took Plaintiff to movies and restaurants (Pl.'s Dep. 153:3-5), and gave him expensive gifts, such as a Movado watch, a cellular phone and fencing equipment. (Minora Dep. 15:4-10; 17:14-16.) The Diocesan Defendants agree that Liberatore's actions with regard to Plaintiff would be characterized as grooming behavior. (Timlin Dep. 36:8-37:9.) Liberatore also provided counseling to Plaintiff and Plaintiff's mother after Plaintiff's father had taken ill and, then, passed away. (Moe Decl. ¶¶ 22-25.) Liberatore became a father figure to Plaintiff. (*Id.*; Pl.'s Dep. 189:20-190:1.)

   Eventually, Liberatore began to make sexual overtures toward Plaintiff. (Pl.'s Dep. 166:7-10.) More than two years of sexual abuse ensued, ultimately ending in May of 2002. (*See* Doc. 1-1 ¶ 37.) During this period of time, Plaintiff would routinely sleep in Liberatore's bed in the Rectory at Sacred Heart. (Pl.'s Dep. 169:24-25.) On nights Plaintiff would sleep over, Liberatore would oftentimes "spoon" Plaintiff (Pl.'s Dep. 173:5-10) — that is, Liberatore and Plaintiff would lie in bed on their sides with Liberatore's front to Plaintiff's back, such that they fit together in a manner similar to spoons. Wikipedia, *supra*, "Spooning", http://en.wikipedia.org/wiki/Spooning. On many nights, Liberatore would masturbate while Plaintiff was lying with him in bed. (Pl.'s Dep. 173:10-14.)

   Plaintiff also related incidents in which Liberatore would grope Plaintiff's genitals (Pl.'s Dep. 173:21-25), wear Plaintiff's clothes (Pl.'s Dep. 173:21-22), and describe sexual techniques and other graphic sexual behavior (Pl.'s Dep. 179:1-5). Liberatore would also wrestle with Plaintiff, oftentimes groping him in a sexual manner rather than attempt a wrestling maneuver. (Pl.'s Dep. 65:18-66:2.) Liberatore also

admitted to Plaintiff that he was a homosexual, and described to
Plaintiff sexually explicit acts which he and his homosexual
friends would perform. (Pl.'s Dep. 179:12-16.) Liberatore also
took Plaintiff on trips to New York, staying overnight in a
single hotel room with only one
**Page 9**
bed. (Pl.'s Dep. 189:5-14.) In addition, Liberatore took
Plaintiff to Belgium while he was completing his dissertation.
(Pl.'s Dep. 152:12; Minora Dep. 15:6.) While in Belgium,
Plaintiff slept in the same bed with Liberatore, who would
masturbate in the bed and grope Plaintiff while he tried to
sleep. (Pl.'s Dep. 245:7-13.)

### C. The Diocesan Defendants

On several occasions the Diocesan Defendants were informed of
some of the behavior involving Liberatore and Plaintiff. In
January of 2001, Patricia Minora ("Minora"), a friend of
Plaintiff's mother, spoke to two priests with whom she had been
long-time friends, Monsignors Kevin O'Neill and Joseph Kelly,
about her suspicions concerning the relationship between
Liberatore and Plaintiff. (Minora Dep. 21:14-31:8.) Minora told
them that Plaintiff slept overnight in the Rectory with
Liberatore, and that Liberatore had given Plaintiff extravagant
gifts and even taken Plaintiff on overnight trips. (Id.) These
priests advised Minora to contact Father Kopacz and inform him of
her suspicions. (Id.) Minora then called Father Kopacz and told
him of the relationship between Liberatore and Plaintiff. (Id.)

After receiving a phone call from Minora concerning the
relationship between Liberatore and Plaintiff, Monsignor Kevin
O'Neill wrote a letter to Bishop Timlin
**West Page 751**
informing him as to what Minora had told him — i.e., that
Plaintiff had been sleeping overnight in Liberatore's bedroom at
the Rectory and that Liberatore had taken Plaintiff on several
overnight trips. (Letter from Monsignor Kevin O'Neill to Bishop
Timlin, dated January 29, 2001, Doc. 89-4 p. 34 of 42, "O'Neill
Letter".)

Additionally, in late 2000 and early 2001, Ann Marie Zongilla
("Zongilla"), a cook and housekeeper at Sacred Heart
(Ann Marie Zongilla Dep. 6:24-25, Jan. 30, 2006, Doc. 89-4), voiced her
suspicion that Liberatore was sexually abusing Plaintiff to Susan
**Page 10**
Doxbeck, the Pastoral Assistant at Sacred Heart, Father
Emmanuel, a priest at Sacred Heart, Reverend Edward Williams
("Father Williams"), also a priest at Sacred Heart, and Monsignor
John Bendik. (Zongilla Dep. 28:18-21; 36:21-24; 37:6-8; 44:2-9;
60:13-15; Reverend Edward Williams Dep. 35:19-23, Jan. 26, 2006,
Doc. 80-2.)

In the fall of 2001 (see Williams Dep. 35:19-23), Helen
Negvesky ("Negvesky"), an employee for the Diocese, informed
Monsignor Bendik of her concerns about the relationship between
Liberatore and Plaintiff. (Helen Negvesky Dep. 40:5-21, Nov. 17,
2005, Doc. 80-4.) Negvesky testified that she told Monsignor
Bendik that Plaintiff was "around the Rectory more than [she]
thought he should be, and the way Father [Liberatore] looked at
him, that they went places together, and just that it didn't seem
right, . . . [and] it didn't look good." (Negvesky Dep.

41:22-42:3.) Negvesky also told Monsignor Bendik of an incident
in which Plaintiff "put his hand down Liberatore's pants."
(Negvesky Dep. 42:14-17.) Negvesky also stated that there were
empty bottles of alcohol littered around Liberatore's room in the
Rectory, and, consequently, she suspected that Liberatore was
plying Plaintiff with alcohol. (Negvesky Dep. 43:14-22.)

Also in the fall of 2001, after receiving reports from Negvesky
and Zongilla concerning suspicious behavior engaged in by
Liberatore and Plaintiff, Father Williams spoke with Monsignor
Bendik about the relationship between Liberatore and Plaintiff.
(Williams Dep. 35:19-36:25.) Father Williams informed Monsignor
Bendik that he thought Liberatore was obsessed with Plaintiff and
that Liberatore spent an inordinate amount of time with
Plaintiff, including wrestling with Plaintiff and taking
Plaintiff on overnight trips. (Williams Dep. 35:19-36:25.) Father
Williams also told Monsignor Bendik that the Sacred Heart staff
suspected that Liberatore was sexually abusing Plaintiff.
**Page 11**
(Williams Dep. 37:7-9.)

Monsignor John Bendik acknowledged that he had received calls
from Negvesky and Zongilla, each of whom voiced a suspicion that
Liberatore was sexually abusing Plaintiff. (Monsignor John Bendik
Dep. 38:18-19; 41:1; 41:20; 47:1-2, Doc. 89-1.) Monsignor Bendik
also stated that he had spoken with Father Williams, who
expressed his own concerns regarding the impropriety of the
relationship between Liberatore and Plaintiff. (Bendik Dep.
52:15-17.) After his conversation with Father Williams, Monsignor
Bendik contacted Father Kopacz and "told him there was a concern
expressed to me from the Parish of Sacred Heart about [the]
relationship [between Liberatore and Plaintiff]." (Bendik Dep.
38:18-22.) Specifically, Monsignor Bendik told Father Kopacz that
Liberatore had "a relationship with a young man [at Sacred Heart]
parish that could be going beyond the barriers, beyond the
parameters, and he better check it out." (Bendik Dep. 65:18-20.)
Monsignor Bendik also told Father Kopacz that "something had
better be done for the sake of [Plaintiff]." (Bendik Dep.
61:11-12.)
**West Page 752**

As noted above, Bishop Timlin was informed of Liberatore's
behavior, with regard to both Roe and Plaintiff, and the
suspicions raised by it. With regard to Roe, Bishop Timlin
received the Bambera Memo informing him of Father Bambera's
"grave concern[s]" regarding the relationship between Liberatore
and Roe, including the fact that Roe was often in Liberatore's
room until late at night. (Bambera Memo.) Bishop Timlin was also
notified of the incident that occurred late at night at the
Seminary involving Liberatore and Roe. (Bohr Dep. 42:8-43:11.) In
addition, Bishop Timlin was informed of Poe giving Liberatore a
back massage while Liberatore lay on Poe's bed. (Summary at 2.)
**Page 12**

With regard to Plaintiff, in January of 2001, Bishop Timlin
received the O'Neill Letter informing him that Plaintiff
oftentimes slept overnight in Liberatore's bedroom at the Rectory
and that Liberatore had taken Plaintiff on several overnight
trips. (O'Neill Letter.)

**D. Brother Antonio F. Antonucci**

Brother Antonio Antonucci, a Benedictine monk who moved to Scranton in the Fall of 2000 to attend the University of Scranton (Brother Antonio Antonucci Dep. 12:7-13:14-15; 14:12-13, Sept. 18, 2006, Doc. 90-2), was also informed of Liberatore's sexual abuse of Plaintiff. (Pl.'s Dep. 65:1-66:19). Specifically, Plaintiff told Brother Antonucci, who worked as a cantor, custodian and cook at Sacred Heart (Doc. 76 ¶ 5), that he slept in Liberatore's bed in the Rectory (Pl.'s Dep. 64:8-11), and that Liberatore would grope Plaintiff in a sexual manner while they wrestled. (Pl.'s Dep. 65:14-66:5.) Rather than encourage Plaintiff to contact the police, or, at the least, tell his mother, Brother Antonucci instructed Plaintiff "to forgive [Liberatore], to keep the issue private, and to not let other people know because it would ruin [Plaintiff's] life and [the lives of] others." (Pl.'s Dep. 66:12-15.)

### E. Plaintiff's Relationship with Liberatore Ends

In May of 2002, when Plaintiff was seventeen (17) years old, Liberatore touched Plaintiff's genitals while they were in Liberatore's office at the University of Scranton. (Votum of Bishop Joseph Martino, dated July 23, 2004, Doc. 88-2 pp. 2-3, "Votum".) Later that month, Liberatore took Plaintiff on a trip to New York, staying overnight in the same bed at a hotel. (*See* Pl.'s Dep. 197:23-25; 199:19-23; Doc. 1-1 ¶ 37.) During the
**Page 13**
night, Liberatore tried to give Plaintiff oral sex, placing his mouth around Plaintiff's penis. (Pl.'s Dep. 199:19-23.) At this point, it became obvious to Plaintiff that Liberatore had homosexual intentions regarding him. (*Id.*) These were the last incidents of sexual abuse perpetrated by Liberatore upon Plaintiff.

### F. Liberatore's Dismissal from the Clergy and his Criminal Convictions

In July of 2003, Joseph Martino was named Bishop of Scranton, replacing Bishop Timlin. (Bishop Joseph Martino Dep. 10:5, July 13, 2006, Doc. 88-3.) Martino officially became Bishop on October 1, 2003. (Bishop Martino Dep. 11:9.) At some point early in his tenure, Bishop Martino became aware of the rumors and incidents involving Liberatore. (Bishop Martino Dep. 14:5-8.) Upon review of Liberatore's personnel file, Bishop Martino became "alarmed" at the history of inappropriate behavior. (Bishop Martino Dep. 21:12-25.) Bishop Martino was troubled by the incident at the Seminary involving Roe, the back massage involving Peter Poe, and another incident which occurred in December of 2002 while Liberatore was visiting the Catholic University of Louvain in Belgium. (*See* Bishop Martino Dep. 32:12-33:25.) Bishop Martino discovered
**West Page 753**
that, sometime during Liberatore's tenure as a priest in the Diocese, he had been sent to Southdown Institute, a non-profit clinic and psychological treatment facility for clergy located in Ontario, Canada, http://www.southdown.on.ca/#. (*See* Bishop Martino Dep. 39:23-40:2.) Bishop Martino spoke with Liberatore in late November of 2003 about the concerns raised by Liberatore's file. (Bishop Martino Dep. 41:5-20.)

In January of 2004, Plaintiff and another young man came

forward and alleged that Liberatore had sexually abused them.
(*See* Bishop Martino Dep. 108:16-18.) Later
**Page 14**
that month, Bishop Martino hired an investigator, James Seidel
("Seidel"), to investigate these allegations.
(Bishop Martino Dep. 108:8-11; *see* James Seidel Investigative Insert, Doc.
pp. 16-17.)

In May of 2004, Liberatore was arrested and charged with sexual
abuse in the State of New York, as well as multiple counts of
indecent assault and corruption of minors in the Commonwealth of
Pennsylvania. (Doc. 89-3 pp. 34-44; Doc. 41-2 p. 24.) Liberatore
pleaded guilty to those offenses. (*Id.*) On July 23, 2004, Bishop
Martino dismissed Liberatore from the clerical state, having
concluded that "the delict of sexual abuse of a minor was
committed by the Reverend Albert M. Liberatore." (Votum at 1.)

## II. Procedural History

On November 5, 2004, Plaintiff filed a Complaint in this Court.
(Doc. 1-1.) Therein, Plaintiff asserted a claim pursuant to
**18 U.S.C. § 2255**, a section of The Child Abuse Victims' Rights Act
of 1986. (Doc. 1-1 ¶¶ 48-51.) Plaintiff also raised state law
claims of assault and battery (Doc. 1-1 ¶¶ 52-55), vicarious
liability (Doc. 1-1 ¶¶ 56-62), aiding and abetting (Doc. 1-1
¶¶ 63-68), negligent hiring, supervision and retention (Doc. 1-1
¶¶ 69-75), negligence per se (Doc. 1-1 ¶¶ 76-81), intentional
infliction of emotional distress (Doc. 1-1 ¶¶ 82-88), and breach
of fiduciary duty (Doc. 1-1 ¶¶ 89-95). On November 3, 2006, both
the Diocesan Defendants and Brother Antonucci filed motions for
summary judgment. (Docs. 75, 76.) These motions are fully briefed
and ripe for disposition.

### LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there
**Page 15**
is no genuine issue as to any material fact and that the moving
party is entitled to a judgment as a matter of law."
FED. R. CIV. P. **56**(c). A fact is material if proof of its existence or
nonexistence might affect the outcome of the suit under the
applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*,
**477 U.S. 242**, **248** (1986).

Where there is no material fact in dispute, the moving party
need only establish that it is entitled to judgment as a matter
of law. Where, however, there is a disputed issue of material
fact, summary judgment is appropriate only if the factual dispute
is not a genuine one. *See id.* at 248. An issue of material fact
is genuine if "a reasonable jury could return a verdict for the
nonmoving party." *Id.*

Where there is a material fact in dispute, the moving party has
the initial burden of proving that: (1) there is no genuine issue
of material fact; and (2) the moving party is entitled to
judgment as a matter of law. *See* CHARLES ALAN WRIGHT & ARTHUR R.
MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727
(2d ed. 1983). The moving party may present its own evidence or, where

the nonmoving party has the burden
**West Page 754**
of proof, simply point out to the Court that "the nonmoving
party has failed to make a sufficient showing of an essential
element of her case." *Celotex Corp. v. Catrett*,
**477 U.S. 317**, **323**, **106 S.Ct. 2548**,
91 L.Ed.2d 265 (1986).

   All doubts as to the existence of a genuine issue of material
fact must be resolved against the moving party, and the entire
record must be examined in the light most favorable to the
nonmoving party. *See White v. Westinghouse Elec. Co.*,
**862 F.2d 56**, **59** (3d Cir. 1988). Once the moving party has satisfied its
initial burden, the burden shifts to the nonmoving party to
either present affirmative evidence supporting its version of the
**Page 16**
material facts or to refute the moving party's contention that
the facts entitle it to judgment as a matter of law. *See
Anderson*, **477 U.S. at 256-257**.

   The Court need not accept mere conclusory allegations, whether
they are made in the complaint or a sworn statement. *Lujan v.
Nat'l Wildlife Fed'n*, **497 U.S. 871**, **888** (1990). In deciding a
motion for summary judgment, "the judge's function is not himself
to weigh the evidence and determine the truth of the matter but
to determine whether there is a genuine issue for trial." 
*Anderson*, **477 U.S. at 249**.

## DISCUSSION

   The Diocesan Defendants now move the Court to grant summary
judgment in their favor as to Counts I, III, V, VI, VII and VIII
of Plaintiff's Complaint. Also, Brother Antonucci moves the Court
to grant summary judgment in his favor as to Counts IV, VI, VII
and VIII of Plaintiff's Complaint. The Diocesan Defendants also
seek summary judgment as to Plaintiff's claim for punitive
damages.

### I. Plaintiff's Federal Law Claim (Count I)

   Under **18 U.S.C. § 2255**, "[a]ny person who, while a minor, was a
victim of a violation of section 2241(c), 2242, 2243, 2251,
2251A, 2252, 2252A, 2260, 2421, 2422 or 2423 of this title[,
sections which prohibit, inter alia, child molestation,
exploitation and pornography,] and who suffers personal injury as
a result of such violation, regardless of whether the injury
occurred while such a person was a minor, may sue in any
appropriate United States District Court and shall recover the
actual damages such person sustains and the costs of the suit,
including a reasonable attorney's fee." Section 2255 thus
provides child victims of sexual abuse, molestation and
exploitation with a federal cause
**Page 17**
of action for money damages. The issue here is against whom may
that federal cause of action be brought. The Diocesan Defendants
argue that section 2255 only subjects Liberatore, the one who has
violated statutes listed in section 2255, to civil liability.
Conversely, Plaintiff argues that the Diocesan Defendants can be
held liable for the offenses committed by Liberatore under the
doctrine of agency.

Neither the United States Supreme Court nor the
United States Court of Appeals for the Third Circuit has had any cases
concerning section 2255. Indeed, there is only a single reported
case involving section 2255.

In *Smith v. Husband*, **376 F. Supp. 2d 603**, **613** (E.D. Va. 2005),
the United States District Court for the Eastern District of
Virginia, held, after analyzing the legislative history of
section 2255 to determine Congress' intent, that a criminal
conviction under one of the listed statutes was not a
prerequisite to the institution of a civil action under
section 2255. The court first noted that section 2255 was enacted as
part of The Child Abuse Victims' Rights

**West Page 755**

Act of 1986 on October 18, 1986. *Id.* at 611; *see*
Pub.L. No. 99-500, 100 Stat. 1783-39
(1986). This enactment expanded the scope of the Protection of
Children Against Sexual Exploitation Act of 1977,
Pub.L. 95-225, 92 Stat. 7 (1978), "to provide
a civil remedy for personal injuries suffered by victims of
child sexual exploitation." *Id.* Initially, this civil
remedy was to be included in the civil Racketeer Influenced and
Corrupt Organizations ("RICO") statutes, which already provided
remedies for victims of crime. *Id.* (citing 132 Cong. Rec.
H3362-02 (daily ed. June 5, 1986) (statement of Rep. Young)
("The Child Abuse Victims['] Rights Act of 1986 is a crucial
piece of legislation. This bill would at last add the sexual
exploitation of children part to the Racketeer □
Influence[d] and Corrupt Organizations statute □")). Later drafts

**Page 18**

of the bill were also proposed to be contained within the RICO
statutes. *Id.* (citing 132 Cong. Rec. E1983-01 (daily ed. June 5,
1986) (statement of Rep. Siljander during extension of remarks)).
"The intent in proposing to include the statute within RICO was
to allow for increased criminal penalties as well as expanded
investigatory powers to arrest perpetrators of the offenses." *Id.*
(citing 132 Cong. Rec. H3362-02 (daily ed. June 5, 1986)
(statement of Rep. Young)). Child pornography, transportation of
minors for illegal sexual activity and related offenses,
sections 2251, 2251A, 2252, 2260, 2421, 2422 and 2423, were, in fact,
added to the definition of racketeering activities under the RICO
statutes. *Id.; see* **18 U.S.C. § 1961**(1)(B) (including within the
definition of "racketeering activity" any act which is indictable
under sections 2251, 2251A, 2252, 2260, 2421, 2422 and 2423).

At first, the proposed civil remedy would have given the
Government or the victim the right to sue the offender in order
to receive treble damages and attorney fees, but not until after
the "offender [was] convicted under Civil RICO." 132 Cong. Rec.
E290-02 (Feb. 5, 1986) (statement of Rep. Siljander) ("If an
offender is convicted under Civil RICO, the Government or the
victim is given the right to sue the offender in order to receive
treble damages and attorney fees"). In later debates, a bill was
proposed that provided a cause of action to any person injured
personally *from an act indictable* under certain child sexual
exploitation statutes. *Smith*, **376 F. Supp. 2d at 611** (citing 132
Cong. Rec. E1983-01 (daily ed. June 5, 1986) (statement of Rep.
Siljander during extension of remarks)). During later
congressional proceedings, one of the congressional

representatives who introduced the bill stated "[f]or purposes of
[section 2255], violations are to be determined by a
preponderance of the evidence. Successful plaintiffs are entitled
to recover the cost

**Page 19**

of the suit, including a reasonable attorney's fee, *from those
found guilty of a violation*." 132 Cong. Rec. E3242-02 (daily ed.
September 23, 1986) (statement of Rep. Green during extension of
remarks) (emphasis added); *see id.*

Based on this legislative history, the *Smith* court concluded
that Congress' intent was "to make the civil remedies provision
available to any victim able to show by a preponderance of the
evidence that *the defendant committed the acts described in any
of the listed offenses.*" *Id.* at 613 (emphasis added).

This Court concludes that, based upon *Smith* and the legislative
history of section 2255, in order to be subject to liability
under section 2255, a defendant must be proven to have violated
at least one of the criminal statutes listed in section 2255 by a
preponderance of the evidence.

Here, there is sufficient evidence that would allow a
reasonable jury to conclude that such violations occurred, as
Plaintiff has offered evidence that Liberatore knowingly

**West Page 756**

transported Plaintiff, while a minor, to New York and Europe, in
interstate and foreign commerce, with the intent of engaging in
illegal sexual activity with Plaintiff, in violation of
**18 U.S.C. §§ 2421**, **2422** and
**2423**. However, the Diocesan Defendants argue that
they did not take part in Liberatore's criminal activities. As
such, they contend they cannot be liable under section 2255.

Under **18 U.S.C. § 2**(a), "[w]hoever commits an offense against
the United States or aids, abets, counsels, commands, induces or
procures its commission is punishable *as a principal*" (emphasis
added). As such, one who criminally aids or abets a listed
offense is punishable as though he himself committed the offense.
*United States v. Private*

**Page 20**

*Sanitation Industry Association of Nassau/Suffolk, Inc.*,
**793 F. Supp. 1114**, **1134** (E.D.N.Y. 1992). Consequently, if one has aided
or abetted another in violating one of the statutes listed in
section 2255, then he himself has committed an act indictable
under that listed statute. As the aider or abettor has himself
committed an indictable act, he is liable to the plaintiff under
section 2255. *See* 132 Cong. Rec. E1983-01 (daily ed. June 5,
1986) (statement of Rep. Siljander during extension of remarks).
Accordingly, if the Diocesan Defendants criminally aided or
abetted Liberatore in the commission of his sexual offenses, they
may be held liable under section 2255.

In order to establish the offense of criminal aiding and
abetting, it must be shown that: (1) the substantive offense has
been committed; (2) the defendant knew the offense was being
committed; and (3) the defendant acted with the intent to
facilitate it. *United States v. Cartwright*, **359 F.3d 281**, **287** (3d
Cir. 2004) (citations omitted); *see also United States v. Newman*,
**490 F.2d 139**, **143** (3d Cir. 1974) (in order to be liable as an

aider or abettor, the defendant must have participated in the substantive crime with the desire that the crime be accomplished; unknowing participation is not sufficient to constitute an offense under the aiding and abetting statute). "[A]cting with intent to facilitate the substantive offense requires that one acted with the `intent to help those involved with a *certain* crime.'" *United States v. Salmon*, **944 F.2d 1106**, **1113** (3d Cir. 1991) (quoting *United States v. Wexler*, **838 F.2d 88**, **92** (3d Cir. 1988)). Indeed, "[t]he state of mind required for conviction as an aider and abettor is the same state of mind as required for the principal offense." *United States v. Centner*, 116 F.3d 473 (Table), 1997 WL 328766, at *2 (4th Cir. 1997); *United States v. Loder*, **23 F.3d 586**, **591** (1st Cir. 1994); *United*

*States v. Valencia*, **907 F.2d 671**, **680** (7th Cir. 1990); *United States v. Gallishaw*, **428 F.2d 760** (2d Cir. 1970).

As noted, there is sufficient evidence to allow a reasonable jury to conclude that multiple listed offenses were committed by Liberatore. As such, the first element of criminal aiding and abetting is satisfied. However, even viewing the evidence in the light most favorable to Plaintiff, the Court concludes that no reasonable jury could find that the second and third elements of the aiding and abetting offense are satisfied. While Plaintiff's evidence demonstrates that the Diocesan Defendants had reason to suspect that Liberatore was sexually abusing Plaintiff, there is nothing in the record demonstrating that the Diocesan Defendants consciously shared Liberatore's knowledge of the underlying substantive offenses, as well as the specific criminal intent to commit them. *See Loder*, **23 F.3d at 591**. Indeed, "[a] general suspicion that an unlawful act may occur is not enough." *United States v. Labat*, **905 F.2d 18**, **23** (2d Cir. 1990). While it is possible to infer knowledge from a combination of suspicion and indifference to the truth, *see United States v. Talkington*, **875 F.2d 591**, **595** (7th Cir.

1989) (upholding district court's use of the so-called "ostrich instruction," which allows the inference of knowledge if it is found that the putative aider or abettor had a strong suspicion yet shut his eyes for fear of what he would learn), there still remains no evidence even remotely suggesting that the Diocesan Defendants shared Liberatore's specific intent to commit the sexual offenses. While the Diocesan Defendants may have avoided learning of Liberatore's offenses, there is no evidence that the Diocesan Defendants desired that his crimes be accomplished. Also absent from the record is any evidence showing that the Diocesan Defendants actively participated in some manner to assist Liberatore in the commission

of his offenses. As such, the Diocesan Defendants' motion for summary judgement will be granted as to Count I of Plaintiff's Complaint.

## II. Subject Matter Jurisdiction

Under **28 U.S.C. § 1367**(a), "the district court shall have supplemental jurisdiction over all of the claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article **III** of the United States Constitution. Such supplemental

jurisdiction shall include claims that include joinder or intervention of additional parties." Thus, section 1367(a) provides for pendent-party jurisdiction in federal question cases. *Exxon Mobil Corp. v. Allapattah Services, Inc.*, **545 U.S. 546**, **558** (2005) ("[t]he last sentence of § 1367(a) makes it clear that the grant of supplemental jurisdiction extends to claims involving joinder or intervention of additional parties"). Consequently, this Court may exercise supplemental jurisdiction over Plaintiff's state law claims against the Diocesan Defendants and Brother Antonucci so long as these claims share a common nucleus of operative fact with Plaintiff's federal law claim against Liberatore such that Plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs*, **383 U.S. 715**, **725** (1966).

Under Third Circuit jurisprudence, "mere tangential overlap of facts is insufficient [to constitute a common nucleus of operative fact], but total congruity between the operative facts . . . is unnecessary." *Nanavati v. Burdette Tomlin Memorial Hospital*, **857 F.2d 96**, **105** (3d Cir. 1988). Plaintiff's state law claims against the Diocesan Defendants and Brother Antonucci satisfy this standard.
**Page 23**

Plaintiff's federal claim against Liberatore arose from sexual abuse that was perpetrated by Liberatore while he was a priest within the Diocese. Plaintiff's state claims against the Diocesan Defendants and Brother Antonucci are based on these same facts, with the caveat that Plaintiff's state claims require proof of additional facts beyond merely Liberatore's acts of abuse. Thus, while not totally congruous, Plaintiff's federal and state claims share more than a mere tangential overlap. As such, Plaintiff's state law claims against the Diocesan Defendants and Brother Antonucci share a common nucleus of operative fact with his federal law claims against Liberatore. Therefore, the Court has jurisdiction over all of Plaintiff's federal and state claims.

The Court will now address Plaintiff's state law claims against the Diocesan Defendants and Brother Antonucci.

### III. Plaintiff's State Law Claims against the Diocesan Defendants and Brother Antonucci (Counts III, IV, V, VI, VII and VIII)

#### A. Vicarious Liability (Count III)

In Count III, Plaintiff alleges that the Diocese, Sacred Heart and Bishop Timlin
**West Page 758**
are vicariously liable for Liberatore's sexual molestation of Plaintiff, and that these acts were performed during the course of and within the scope of Liberatore's employment as a priest. The Diocese, Sacred Heart and Bishop Timlin now move for summary judgment as to this count, arguing that Liberatore's acts were committed outside the scope of his employment.

Under Pennsylvania law, "an employer is held vicariously liable for the negligent acts of his employee which cause injuries to a third party, provided that such acts were
**Page 24**
committed during the course of and within the scope of the employment." *Fitzgerald v. McCutcheon*, **410 A.2d 1270**, **1271**

(Pa.Super.Ct. 1979). "In certain circumstances, liability of the employer may also extend to intentional or criminal acts committed by the employee." *Id.* "The conduct of an employee is considered `within the scope of employment' for purposes of vicarious liability if: (1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer." *R.A. ex rel. N.A. v. First Church of Christ*, **748 A.2d 692**, **699** (Pa.Super.Ct. 2000). "Where, however, the employee commits an act encompassing the use of force which is excessive and so dangerous as to be totally without responsibility or reason, the employer is not responsible as a matter of law." *Fitzgerald*, **410 A.2d at 1272**. Indeed, "a master is not liable for the willful misconduct of his servant, and that such willful misconduct, while it may be within the course of the employment, is not within the scope thereof." *McMaster v. Reale*, **110 A.2d 831**, **832** (Pa.Super.Ct. 1955).

In addition, Pennsylvania courts have held that "an assault committed by an employee upon another for personal reasons or in an outrageous manner is not actuated by an intent to perform the business of the employer and, as such, is not within the scope of employment." *Fitzgerald*, **410 A.2d at 1272**. For example, in *Sanchez by Rivera v. Montanez*, **645 A.2d 383** (Pa.Commw.Ct. 1994), a child and his parents sued a community action agency, alleging that the agency was vicariously liable for an
**Page 25**
employee's sexual molestation of the plaintiff child. The Commonwealth Court of Pennsylvania affirmed the trial court's entry of summary judgment in the defendant agency's favor, holding that the employee's actions were clearly outrageous and motivated purely by personal reasons. *Id.* at 391.

Here, it is clear that Liberatore's sexual molestation of Plaintiff was not within the scope or nature of his employment as a priest. Indeed, "[t]he activity of which [Plaintiff] now complains is wholly inconsistent with the role of one who is received into the Holy Orders as an ordained priest of the Roman Catholic Church." *Hutchison by Hutchison v. Luddy*, **683 A.2d 1254**, **1256** (Pa.Super.Ct. 1996). Moreover, the acts of sexual abuse perpetrated by Liberatore were both outrageous and certainly not actuated by any purpose of serving the Diocese, Sacred Heart or Bishop Timlin. As such, no reasonable jury could find in favor of Plaintiff on his vicarious liability claim. Therefore, the Court will grant summary judgment in favor of the Diocese, Sacred Heart and Bishop Timlin as to Count III of Plaintiff's Complaint.

**B. Aiding and Abetting (Count IV)**

In Count IV, Plaintiff sets forth a claim against Brother Antonucci for tortiously
**West Page 759**
aiding and abetting Liberatore in his sexual abuse of Plaintiff. Under this theory of liability, based upon section 876 of the Restatement (Second) of Torts, "one is subject to liability for harm to a third person arising from the tortious conduct of another if he (a) does a tortious act in concert with the other or pursuant to a common design with him; (b) knows that the

other's conduct constitutes a breach of duty and gives
substantial assistance or encouragement to the other so to conduct
himself; or (c) gives substantial
**Page 26**
assistance to the other in accomplishing a tortious result and
his own conduct, separately considered, constitutes a breach of
duty to the third person." *Koken v. Steinberg*, **825 A.2d 723**, **731**
(Pa.Commw.Ct. 2003).

Plaintiff neither avers, nor has presented evidence, that
Brother Antonucci acted with Liberatore in a common scheme or
plan. Subsection (a) is thus inapplicable.

To determine whether Brother Antonucci provided "substantial
assistance" to Liberatore, the comments to section 876 of the
Restatement provide a list of five factors: (1) the nature of the
act encouraged; (2) the amount of assistance given by the
defendant; (3) the defendant's presence or absence at the time of
the tort; (4) the defendant's relation to the tortfeasor; and (5)
the defendant's state of mind. *Hurley v. Atlantic City Police
Dep't*, **174 F.3d 95**, **127** n. 27 (3d Cir. 1999). A sixth factor —
the duration of the assistance provided — is also considered.
*Id.* (citing *Halberstam v. Welch*, **705 F.2d 472**, **484** (D.C. Cir.
1983).

Here, Plaintiff has failed to offer sufficient evidence to
allow a reasonable jury to conclude that Brother Antonucci gave
substantial assistance or encouragement to Liberatore. Plaintiff
has offered evidence that Brother Antonucci dissuaded Plaintiff
and his mother from reporting Liberatore's abuse to the
authorities, instead suggesting that Plaintiff forgive Liberatore
for his misdeeds. Under Pennsylvania case law, "substantial
assistance" requires that the putative aider or abetter take some
affirmative action which causes the tortious actor to conduct
himself inappropriately. *Welc v. Porter*, **675 A.2d 334**, **338-39**
(Pa.Super.Ct. 1996) (holding that the plaintiff, who was
injured in a motor vehicle accident with a drunk driver, could
not recover from the drunk driver's passenger, as an aider or
abetter under section 876(b) of the Restatement, because the
plaintiff did
**Page 27**
not aver that the passenger "engaged in any conduct that
substantially assisted or encouraged [the driver] to consume
alcohol and operate his vehicle in a negligent or reckless
manner"); *see Cruz v. Roberts*, No. CI-04-01947, 2005 WL 1349615,
at *235-36 (Pa. C.P. Jan. 26, 2005) (Plaintiff's complaint,
arising out of allegations of child sexual abuse by employee of
day care center, failed to state claim against the day care
center and its owners for tortious aiding and abetting because it
"fail[ed] to contain any allegations that the defendants
affirmatively acted in any way to assist [the employee] in
committing his alleged misdeeds").

Here, there is simply no evidence that Brother Antonucci aided
the efforts of Liberatore or encouraged or incited him to commit
his abusive acts. There is no evidence that Brother Antonucci was
present during the commission of the abuse. Moreover, despite
Brother Antonucci's advice, Plaintiff and his mother were
entirely free to ignore him and contact the authorities on their
own accord. As such, Brother Antonucci's efforts to dissuade
Plaintiff and his mother from contacting the authorities cannot

be viewed as "substantial assistance." Accordingly, the Court will grant Brother Antonucci's motion for summary judgment as to Count IV of Plaintiff's Complaint.

**West Page 760**

### C. Negligent Hiring, Supervision and Retention (Count V)

Plaintiff next claims that the Diocese, Sacred Heart and Bishop Timlin are liable for negligence in their hiring, supervision and retention of Liberatore as a Diocesan priest.

Under Pennsylvania law, an employer is subject to liability for harm resulting from his conduct if he is negligent or reckless "in the employment of improper persons or instrumentalities in work involving risk of harm to others; . . . in the supervision of the activity; or . . . in permitting, or failing to prevent, negligent or other tortious conduct by

**Page 28**

persons, whether or not his servants or agents, upon premises or with instrumentalities under his control." *R.A. ex rel. N.A.*, **748 A.2d at 697** (citing RESTATEMENT (SECOND) OF AGENCY § 213(b), (d) (1958). Moreover, a master has a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if (a) the servant is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or is using a chattel of the master, and (b) the master knows or has reason to know that he has the ability to control his servant, and knows or should know of the necessity and opportunity for exercising such control. *R.A. ex rel. N.A.*, **748 A.2d at 697** (citing RESTATEMENT (SECOND) OF TORTS § 317(a), (b) (1965)).

Accordingly, an employer owes a duty "to exercise reasonable care in selecting, supervising and controlling employees." *Id.* The Supreme Court of Pennsylvania has held that, "[t]o fasten liability on an employer[,] . . . it must be shown that the employer knew or, in the exercise of ordinary care, should have known of the necessity for exercising control of his employee." *Dempsey v. Walso Bureau, Inc.*, **246 A.2d 418**, **422** (Pa. 1968) (stating that, in a case in which an employee committed an assault, the employer may be liable for the failure to exercise reasonable care in determining the employee's propensity for violence).

In the instant case, the Diocese, Sacred Heart and Bishop Timlin may be liable if they knew or should have known that Liberatore had a propensity for committing sexual abuse and his employment as Pastor at Sacred Heart might create a situation where his propensity would harm a third person, such as Plaintiff. *See Coath v. Jones*,

**Page 29**

**419 A.2d 1249**, **1250-52** (Pa.Super.Ct. 1980) (holding, in a case in which a former employee of the defendant-employer raped the plaintiff after having gained entry to her home by representing that he was there on the defendant's business, first, that the defendant could be found liable if the perpetrator was known to have the inclination to assault women or if the defendant should have known that, and, second, that "if it were foreseeable by the defendant that [the perpetrator] . . . could attack a customer

because he had, on a previous occasion, been admitted to her home on the employer's business, then there would exist a special relationship between defendant and the customer and a duty on the employer to give a reasonable warning to the customer).

When viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that the Diocese, Sacred Heart and Bishop Timlin were negligent or reckless in supervising and retaining Liberatore. However, the Court concludes that a reasonable jury could not find that the Diocese, Sacred Heart and Bishop Timlin were negligent or reckless in hiring Liberatore because there is no evidence suggesting that Liberatore
**West Page 761**
was or would become a child sex predator when he was hired in 1995.

As noted above, under Section 213(b) of the Restatement (Second) of Agency, a principal is liable for harm resulting from his conduct if he is negligent or reckless in the employment of improper persons in work involving risk of harm to others. RESTATEMENT (SECOND) OF AGENCY § 213(b). Additionally, under Section 213(d) of the Restatement (Second) of Agency, a principal is liable for harm resulting from his conduct if he is negligent or reckless in permitting, or failing to prevent, negligent or other tortious conduct by persons upon his premises. RESTATEMENT (SECOND) OF AGENCY § 213(d).

Here, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury
**Page 30**
could find that the Diocese, Sacred Heart and Bishop Timlin were negligent or reckless in retaining Liberatore because the jury could conclude that Liberatore was an improper person who posed a risk of sexual abuse to minor males. A reasonable jury could also find that the Diocese, Sacred Heart and Bishop Timlin were negligent or reckless in permitting, or failing to prevent, negligent or other tortious conduct by persons on church premises based on Liberatore's sexual abuse of Plaintiff in the Sacred Heart Rectory.

There is evidence that Bishop Timlin was informed that Plaintiff was sleeping in Liberatore's bedroom at the Rectory and that Liberatore had taken Plaintiff on several overnight trips (O'Neill Letter). Bishop Timlin acknowledged that he would characterize such activity as grooming behavior. (Timlin Dep. 36:8-37:9.) Bishop Timlin was informed of Liberatore's inappropriate behavior with Roe and Poe. (Bohr Dep. 42:8-43:11; Summary at 2.) Shortly thereafter, Bishop Timlin removed Liberatore from the Seminary. However, rather than dismiss Liberatore as a Diocesan priest, Bishop Timlin assigned him to another parish within the Diocese. Based on this evidence, a reasonable jury could infer that this provided Liberatore the opportunity to befriend Plaintiff and then sexually abuse him.

Further, the awareness of the potential Liberatore posed as a pedophile raises the question of the relevance of the Diocese's and Bishop Timlin's awareness of Liberatore's behavior with Roe. The Court finds it relevant for the following reasons.

A Roman Catholic priest takes a vow of celibacy at his

ordination and, therefore, is called to refrain from any and all sexual activity. Wikipedia, *supra*, "Clerical Celibacy", http://en.wikipedia.org/wiki/Celibacy#Clerical_celibacy. While any sexual act outside the sacrament of marriage is forbidden by the Church, Wikipedia, *supra*, "Roman Catholic
**Page 31**
Church", http://en.wikipedia.org/wiki/Roman_Catholic_Church#Sexuality, homosexual acts are considered to be "intrinsically immoral" and "contrary to the natural law." Wikipedia, *supra*, "Instruction Concerning the Criteria for the Discernment of Vocations with regard to Persons with Homosexual Tendencies in view of their Admission to the Seminary and to Holy Orders", http://en.wikipedia.org/wiki/Instruction_Concerning_the_Criteria_for_the_Discernment_of_Vocations_with_regard_to_Persons_with_Homosexual_Tendencies_in_view_of_their_Admission_to_the_Seminary_and_to_Holy_Orders. Indeed, the Church forbids the ordination of men to the priesthood who have "deeply rooted homosexual tendencies." Wikipedia, *supra*, "List of Christian denominational positions on homosexuality", http://en.wikipedia.org/wiki/List_of_Christian_denominational_positions_on_homosexuality#Roman_Catholic_Church. Nevertheless, in general, homosexual behavior
**West Page 762**
between consenting adults does not violate the rules of civil society.

   It does not follow that a homosexual is more likely than a heterosexual to prey on minors of the same sex. As such, standing alone, Liberatore's homosexual behavior with regard to Roe, an adult, would be irrelevant as to the issue of whether the Diocesan Defendants had notice that Liberatore had a propensity to sexually abuse a minor male. However, Liberatore's behavior with regard to Roe becomes relevant, as to the issue of notice to the Diocesan Defendants, by virtue of the fact that it was strikingly similar to that which he later engaged in with regard to Plaintiff.

   Liberatore was in Roe's company a great deal, bought Roe expensive gifts, took Roe on overnight trips and had Roe sleep in his room at the Seminary. This behavior was noticed by colleagues, who, in turn, made their observations and concerns known to
**Page 32**
the Diocesan Defendants. While at Sacred Heart, Liberatore counseled Plaintiff regarding the death of his father, hired Plaintiff as a sacristan, was in Plaintiff's company an inordinate amount of time, purchased expensive gifts for Plaintiff, took Plaintiff on overnight trips and had Plaintiff sleep in his room at the Rectory. Like his relationship with Roe, Liberatore's relationship with Plaintiff drew comment from people who were in a position to view, on a daily basis, much of what occurred between them. These people, in turn, informed the Diocese, Sacred Heart and Bishop Timlin of their observations and concerns.

   Accordingly, Liberatore's homosexual behavior with regard to Roe is legally relevant as to the issue of whether the Diocese, Sacred Heart and Bishop Timlin had notice that Liberatore was, at the very least, grooming Plaintiff for a homosexual relationship, if not already involving him in one.

However, even ignoring Liberatore's relationship with Roe, a reasonable jury could conclude that there was adequate warning to the Diocese, Sacred Heart and Bishop Timlin that Liberatore was grooming Plaintiff for a homosexual relationship, and that it may well have already begun. The notice of Plaintiff's sleepovers in the Rectory, the gifts given to Plaintiff and the overnight trips is sufficient to allow a reasonable jury to conclude that the Diocese, Sacred Heart and Bishop Timlin were negligent or reckless in retaining Liberatore as a Diocesan priest.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could also conclude that the Diocese, Sacred Heart and Bishop Timlin were negligent or reckless in permitting, or failing to prevent, Liberatore's tortious conduct upon church premises, given Plaintiff's statement that Liberatore routinely sexually abused him while

**Page 33**
they slept in Liberatore's bedroom in the Sacred Heart Rectory.

Further, the Court cannot conclude as a matter of law that the Diocese, Sacred Heart and Bishop Timlin are not liable under Section 317 of the Restatement (Second) of Torts, as a reasonable jury could conclude that these defendants knew of the necessity and had the opportunity and ability to control Liberatore's actions, but nevertheless failed to exercise reasonable care to prevent Liberatore, acting outside the scope of his employment, from intentionally harming Plaintiff while on church premises. Given the evidence of Bishop Timlin's awareness of Liberatore's relationship with Roe, Plaintiff's sleeping in Liberatore's bedroom at the Rectory and the overnight trips on which Liberatore had taken Plaintiff, a reasonable jury could conclude that the Diocese, Sacred Heart and Bishop Timlin had reason to believe that Liberatore was, at the very

**West Page 763**
least, grooming this young man, if not already involving him in a sexual relationship.

Consequently, Count V of Plaintiff's Complaint will survive summary judgment to the extent that Plaintiff claims that the Diocese, Sacred Heart and Bishop Timlin were negligent in supervising and retaining Liberatore. The Court will grant summary judgment as to Count V of Plaintiff's Complaint to the extent that Plaintiff claims that Liberatore was negligently hired.

### D. Negligence *Per Se* (Count VI)

In Count VI of his Complaint, Plaintiff sets forth a claim of negligence *per se* arising from Defendants' alleged violation of the Child Protective Services Act, **23 PA. CONS. STAT. ANN. § 6311.** Specifically, Plaintiff alleges that the Diocesan Defendants and Brother Antonucci failed to comply with the reporting requirements of section 6311. The Diocesan Defendants and Brother Antonucci now move this Court for summary

**Page 34**
judgment as to this count. The Diocesan Defendants argue that they never "came into contact" with Plaintiff and thus were not subject to section 6311. Brother Antonucci asserts that, because he was not employed by the Diocese as a priest, he too was not subject to the reporting requirement imposed by section 6311.

Section 6311 provides, in pertinent part:

    Persons who, in the course of their employment,
occupation or practice of their profession, come into
contact with children shall report or cause a report to
be made in accordance with section 6313 (relating to
reporting procedure) when they have reasonable cause to
suspect, on the basis of their medical, professional or
other training and experience, that a child coming
before them in their professional or official capacity
is an abused child.

**23 PA. CONS. STAT. ANN. § 6311**(a). Under section 6311(b),
"persons required to report under subsection (a) include, but are
not limited to, any . . . member of the clergy." 23 PA. CONS.
STAT. ANN. § 6311(b). As is clear from its language,
subsection (b) recites an inclusive, rather than exclusive, list of those
persons required to report.

    Under Pennsylvania law, the elements of a negligence *per se*
action are: (1) the purpose of the statute must be, at least in
part, to protect the interest of the plaintiff, individually, as
opposed to the public; (2) the statute must clearly apply to the
conduct of the defendant; (3) the defendant must violate the
statute; and (4) the violation of the statute must proximately
cause the plaintiff injury. *Jordan v. City of Philadelphia*,
**66 F. Supp. 2d 638**, **644** (E.D. Pa. 1999). After analyzing these factors,
the Court is of the opinion that, when the evidence is viewed in
the light most favorable to Plaintiff, a reasonable jury could
conclude that the Diocesan Defendants and Brother Antonucci
violated section 6311.
**Page 35**

    The first element of Plaintiff's negligence *per se* action is
easily met. Section 6311 was clearly promulgated so as to protect
abused children such as Plaintiff. *J.E.J. v. Tri-County Big
Brothers/Big Sisters, Inc.*, **692 A.2d 582**, **586** (Pa.Super.Ct.
1997).

    Second, clergy are expressly included within the list of
individuals who have a duty to report suspected child abuse.
**23 PA. CONS. STAT. ANN. § 6311**(b). As such, the statute clearly
applies to the Diocesan Defendants.

    The Court is also of the opinion that Brother Antonucci, a
benedictine monk who was hired by Liberatore to serve as a
cantor, custodian and cook at Sacred
**West Page 764**
Heart, but did not serve in a clerical capacity, was a person
required to report under section 6311. While Brother Antonucci
was not a clergyman within the Diocese, section 6311(b) does not
so limit the clergymen included within its reach. Indeed, the
statute requires "any . . . member of the clergy" to report
suspected child abuse. The Court does not interpret this
provision to include only ordained priests within the Diocese
and Brother Antonucci cites no case law so limiting the reach of
section 6311. Brother Antonucci not only was a consecrated monk
and hermit but, according to Plaintiff, he also held himself out
to Plaintiff as a religious and spiritual advisor. In addition,
the statute's intent is to require those persons who come into

contact with children during the course of their employment to
report suspected abuse. Here, there is no question that, during
the course of his employment with Sacred Heart, Brother
Antonucci did in fact come into contact with children, including
Plaintiff. As such, the Court concludes that the Child
Protective Services Act clearly applied to Brother Antonucci.

Third, a reasonable jury could find that Defendants violated
the statute. Viewing the record in the light most favorable to
Plaintiff, there is evidence which supports the
**Page 36**
conclusion that Defendants had "reasonable cause to suspect"
that Liberatore was sexually abusing Plaintiff. The Diocesan
Defendants were informed of Liberatore's past incidents involving
Roe and Poe. They had also been informed of the fact that
Plaintiff was sleeping in Liberatore's bedroom in the Rectory. In
addition, several people had voiced their own concerns and
suspicions regarding the relationship between Liberatore and
Plaintiff, and supported these suspicions with their own personal
observations of Liberatore's behavior towards Plaintiff. As
Plaintiff was a parishioner, alter server and sacristan at Sacred
Heart, and the reports concerned a Diocesan priest's abuse, the
Diocesan Defendants were in sufficient "contact" with Plaintiff
to bring them within the reporting requirements of the Child
Protective Services Act. As for Brother Antonucci, Plaintiff
directly told him of Liberatore's sexual abuse. As such,
Plaintiff "came into contact" with Brother Antonucci.
Accordingly, there was sufficient evidence within the knowledge
of Defendants to create "reasonable cause to suspect" that
Liberatore was sexually abusing Plaintiff. As it is uncontested
that Defendants did not report Liberatore's suspected abuse of
Plaintiff to law enforcement authorities, a reasonable jury could
conclude that Defendants violated section 6311 of the Child
Protective Services Act.

Fourth, when viewing the evidence in the light most favorable
to Plaintiff, a reasonable jury could find that Defendants'
failure to report Liberatore's sexual abuse of Plaintiff, in
violation of section 6311, proximately caused the injuries
Plaintiff suffered. Liberatore was convicted of sexual abuse,
indecent assault and corruption of minors based on his May 2002
assaults upon Plaintiff. The Diocesan Defendants knew as early as
January of 2001 that Plaintiff was sleeping in Liberatore's
bedroom at the Rectory. Plaintiff also stated in his deposition
that he told Brother Antonucci, prior to May of 2002,
**Page 37**
that Liberatore was sexually abusing him. As such, a reasonable
jury could find that, had Defendants reported Liberatore to law
enforcement authorities, Liberatore would not have had the
opportunity to sexually abuse Plaintiff in May of 2002. Summary
judgment as to Count VI is thus inappropriate and will be denied.

### E. Intentional Infliction of Emotional Distress (Count VII)

In Count VII, Plaintiff asserts a claim of intentional
infliction of emotional distress
**West Page 765**
against Liberatore, the Diocese, Sacred Heart, Bishop Timlin,
Father Kopacz and Brother Antonucci. The Diocesan Defendants, as
well as Brother Antonucci, now move the Court to grant summary
judgment as to this claim.

"To prove a claim of intentional infliction of emotional distress, the following elements must be established: (1) the conduct must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; (4) that distress must be severe." *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. 1997). Extreme and outrageous conduct is conduct which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Strickland v. University of Scranton*, **700 A.2d 979**, **987** (Pa.Super.Ct. 1997). Generally, "the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `outrageous'!" *Id.* In addition, to prevail on an intentional infliction of emotional distress cause of action, a plaintiff must provide competent medical evidence to prove the existence of emotional distress. *Kazatsky v. King David Memorial Park, Inc.*, **527 A.2d 988**, **995** (Pa. 1987); *see Hunger v.*

**Page 38**

*Grand Central Sanitation*, **670 A.2d 173** (Pa.Super.Ct. 1996) (holding that, to prevail on intentional infliction of emotional distress claim, a plaintiff must prove that the defendant's conduct was extreme and outrageous and that the plaintiff suffered a medically confirmed injury).

In this case, Plaintiff has failed to present competent medical evidence to support his claim of severe emotional distress, as required under Pennsylvania law. As such, the Court will grant summary judgment as to Count VII of Plaintiff's Complaint.

## F. Breach of Fiduciary Duty (Count VIII)

### 1. Introduction

In Count VIII, Plaintiff alleges that Defendants Liberatore, the Diocesan Defendants and Brother Antonucci breached their respective fiduciary duties to Plaintiff. Plaintiff argues that the Diocesan Defendants, as well as Brother Antonucci, breached their fiduciary duties that were owed to Plaintiff by placing Liberatore in a position to serve as Plaintiff's priest and counselor, by failing to remove Liberatore from that position, and by failing to report Liberatore to law enforcement authorities after having ample reason to believe Liberatore had committed acts of sexual abuse. Plaintiff contends that the Diocesan Defendants and Brother Antonucci, rather than act in his best interest, chose rather to act in their own interests by ignoring and even attempting to conceal Liberatore's sexual abuse of a minor. The Diocesan Defendants have moved for summary judgment as to this count, arguing that Pennsylvania does not recognize a claim for breach of fiduciary duty in a case similar to this one. Brother Antonucci also moves for summary judgment, asserting that the facts do not support Plaintiff's claim.

**Page 39**

Under Pennsylvania law, "[t]he general test for determining the existence of . . . a [fiduciary] relationship is whether it is clear that the parties did not deal on equal terms." *Frowen v. Blank*, **425 A.2d 412**, **416** (Pa. 1981). Indeed, a fiduciary relationship "is not confined to any specific association of the

parties." *Leedom v. Palmer*, 117 A. 410, 411 (Pa. 1922) Rather, a fiduciary relationship will be found to exist "when the circumstances make it certain the parties do not

**West Page 766**

deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible." *Id.*; *see also In re Estate of Clark*, <u>359 A.2d 777</u>, <u>781</u> (Pa. 1976) (a fiduciary relationship exists "as a matter of fact whenever one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other"); *Drob v. Jaffe*, <u>41 A.2d 407</u>, <u>408</u> (Pa. 1945) (a fiduciary relationship "exists wherever one occupies toward another such a position of advisor or counsellor [sic] as reasonably to inspire confidence that he will act in good faith for the other's interest"). One in a fiduciary relationship with another is under a duty to act solely in the interest of that person. *McCarrell v. Cumberland County Employee's Retirement Bd.*, <u>547 A.2d 1293</u>, <u>1296</u> (Pa.Commw.Ct. 1988); *see also Leedom*, 117 A. at 411 (a fiduciary relationship "is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself"). Failure to act in the other's interest results in breach of the duty imposed by the fiduciary relationship. RESTATEMENT (SECOND) OF TORTS § 874 (1979).

The Supreme Court of Pennsylvania has not determined whether or not there is a

**Page 40**

cause of action for breach of fiduciary duty against a priest or diocese. *See Gaines v. Krawczyk*, <u>354 F. Supp. 2d 573</u>, <u>582</u> (W.D. Pa. 2004). Consequently, the Court "must don the soothsayer's garb and predict how [the Supreme Court of Pennsylvania] would rule if it were presented with the question." *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, <u>267 F.3d 340</u>, <u>349</u> (3d Cir. 2001). In making this prediction, the Court should consider decisions of the intermediate and trial courts of the state, federal courts interpreting the particular area of the law in question, and other state supreme courts that have addressed the matters raised. *Wiley v. State Farm Fire & Casualty Co.*, <u>995 F.2d 457</u>, <u>459</u> (3d Cir. 1993).

**2. The Courts of Pennsylvania**

Decisions of the intermediate and trial courts of Pennsylvania provide support for the conclusion that the Supreme Court of Pennsylvania would recognize Plaintiff's breach of fiduciary duty claim against Liberatore and the Diocesan Defendants. These decisions suggest a rule holding that, when a plaintiff had a special relationship with the defendant priest and diocese, such as counseling or participation in church-sponsored activities, a fiduciary relationship will be found to exist and the plaintiff's breach of fiduciary duty claim will be recognized.

The Superior Court of Pennsylvania has on two occasions refused to find a fiduciary relationship between parishioners and the

diocese in actions arising from alleged acts of sexual abuse
perpetrated by diocesan priests. *See Meehan v. Archdiocese of
Philadelphia*, **870 A.2d 912**, **922** n. 9 (Pa.Super.Ct. 2005);
*Baselice v. Franciscan Friars Assumption BVM Province, Inc.*,
**879 A.2d 270**, **279** n. 4 (Pa.Super.Ct.

**Page 41**

2005). In both *Meehan* and *Baselice*, the plaintiffs, victims of
alleged sexual abuse by diocesan priests, had waited until long
after the statute of limitations had expired to pursue their
claims. **870 A.2d at 917-18**; **879 A.2d at 278-79**. The plaintiffs in
both cases argued that they had a fiduciary relationship with
their dioceses, and that, due to this relationship and the
dioceses' general and systematic concealment of the offending
priests' misconduct, the doctrine of fraudulent concealment
tolled the statute of limitations. *Meehan*, **870 A.2d at 921-22**;
*Baselice*, **879 A.2d at 278-79**. The Superior Court on both
occasions rejected

**West Page 767**

the plaintiffs' contentions, holding that the plaintiffs'
relationships with their dioceses, that of mere parishioners,
did not constitute fiduciary relationships. *Meehan*,
**870 A.2d at 922** n. 9; *Baselice*,
**879 A.2d at 279** n. 4. The court reasoned that the
plaintiffs' relationships with their dioceses were too general
in nature, and, thus, did not rise to the higher level
associations involved in fiduciary relationships such as
attorney and client, doctor and patient, or clergy and penitent.
*Meehan*, **870 A.2d at 922** n. 9;
*Baselice*, **879 A.2d at 279** n. 4. As a
counseling relationship is substantially similar to the
priest-penitent relationship, the Superior Court's comparison of
the plaintiff-parishioners' general — parishioner qua
parishioner-relationship with their dioceses to the "specific,
legally recognized higher level association" that characterizes
a priest-penitent relationship suggests that the Superior Court
would recognize a breach of fiduciary duty claim brought by a
plaintiff against a priest and diocese when there existed a
counseling or other special relationship above that of simply a
parishioner.

The Pennsylvania Courts of Common Pleas have on three occasions
recognized a claim against a priest or diocese for breach of
fiduciary duty. *See Morrison v. Diocese of*

**Page 42**

*Altoona-Johnstown*, 68 Pa. D. & C. 4th 473, 2004 WL 3141330
(Pa. C. P. Oct. 20, 2004); *Nardella v. Dattilo*,
36 Pa. D. & C. 4th 364, 1997 WL 1056878 (Pa. C. P. Mar. 21, 1997) (en banc)
*Podolinski v. Episcopal Diocese of Pittsburgh*,
23 Pa. D. & C. 4th 385, 1995 WL 610296 (Pa. C. P. Mar. 22, 1995).

In *Morrison v. Diocese of Altoona-Johnstown*, the court held
that the plaintiff-parishioner had stated a claim for breach of
fiduciary duty against the diocese and its officials in two
respects. 68 Pa. D. & C. 4th at 491, 2004 WL 3141330. First, the
plaintiff, who had reported to diocesan officials that a priest
had sexually abused him while the plaintiff was a minor, had
stated a claim for breach of fiduciary duty stemming from the
diocesan officials' failure to uphold their promise that the
priest would be denied future opportunities to come into contact
with children. *Id.* The court reasoned that the diocesan