UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH JEAN-CHARLES,<br>a/k/a JEAN-CHARLES JOSEPH,<br>            PLAINTIFF<br><br>V.<br><br>DOUGLAS PERLITZ; FATHER PAUL E. CARRIER,<br>S.J.; HOPE E. CARTER; HAITI FUND, INC.;<br>FAIRFIELD UNIVERSITY; THE SOCIETY OF JESUS OF<br>NEW ENGLAND; JOHN DOE ONE; JOHN DOE<br>TWO; JOHN DOE THREE; JOHN DOE FOUR; JOHN<br>DOE FIVE; JOHN DOE SIX; JOHN DOE SEVEN;<br>JOHN DOE EIGHT; JOHN DOE NINE; JOHN DOE<br>TEN; JOHN DOE ELEVEN; AND JOHN DOE<br>TWELVE,<br><br>            DEFENDANTS. | Civil Action No.: 3:11-cv-00614-JCH |

## AMENDED COMPLAINT AND JURY TRIAL DEMAND

### INTRODUCTION

1.      This case arises from the sexual molestation of at least twenty Haitian boys, including Plaintiff Joseph Jean-Charles (a/k/a Jean-Charles Joseph), by Defendant Douglas Perlitz ("Perlitz"), while Perlitz was operating a residential school under the auspices and supervision of Defendants Fairfield University, the Society of Jesus of New England (the "New England Jesuit Order"), the Haiti Fund, Inc. (the "Haiti Fund"), Hope Carter ("Carter"), and Father Paul E. Carrier, S.J. ("Father Carrier").  In 2011, Perlitz was convicted of violating 18 U.S.C. § 2423(b), Travel With Intent To Engage In Illicit Sexual Conduct, but not before he had molested numerous children in his care over a period of many years, without any of the other Defendants taking any steps whatsoever to prevent or stop this horrendous pattern of abuse.  Indeed, Defendants aided and abetted Perlitz's acts, providing him with the means to commit

them, and at least one of the defendants appears to have assisted in attempting to conceal Perlitz's crimes.

2.      Perlitz, Father Carrier, Fairfield University, Carter, and the Haiti Fund established a residential school in the Republic of Haiti, the poorest country in the Western Hemisphere.  This school, Project Pierre Toussaint ("PPT"), purported to provide services to the poorest children of Haiti, many of whom lacked homes and regular meals.  Perlitz, residing in Haiti, was the director of PPT, which provided him with an image of substantial trust and authority.

3.      Perlitz used that trust and authority to sexually molest Plaintiff and numerous other minor boys who attended PPT.  Perlitz also threatened to withhold food and shelter from the impoverished children in his care if they did not comply with his sexual demands, in effect forcing them to earn their food and shelter by trading sexual favors for those necessities.

4.      The other Defendants aided and abetted Perlitz by providing him the means to operate PPT in this manner.  They disregarded warning signs that should have alerted them to the improper nature of Perlitz's relationship with some of the boys in his care and continued to provide funds to PPT long after it was, or should have been clear, that Perlitz was abusing the trust that had been placed in him.   At least one Defendant other than Perlitz actively took steps to prevent enforcement of laws meant to protect minors from the conduct in which Perlitz engaged.

5.      Plaintiff now seeks damages for their personal injuries pursuant to 18 U.S.C. § 2255, 18 U.S.C. § 1595, international law, and the common law.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Plaintiff's statutory claims pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the

United States, specifically 18 U.S.C. §§ 1595 and 2255. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because Plaintiff is a citizen of a foreign state and defendants are citizens of Connecticut, Colorado, and Massachusetts, and pursuant to 28 U.S.C. § 1350 with respect to Plaintiff's claims under international law, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.       Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) (3) in that at least one defendant may be found here.

## PARTIES

8.       Plaintiff Joseph Jean-Charles, also known as Jean-Charles Joseph ("Joseph Jean-Charles" or "Jean-Charles"), is a citizen of the Republic of Haiti residing in Cap-Haitien, Haiti.

9.       Defendant Douglas Perlitz ("Perlitz") is an individual who, at the time of his arrest in 2009 was a citizen of the State of Colorado.  Prior to residing in the State of Colorado, Defendant Perlitz had resided in the State of Connecticut.  While a resident of Connecticut, Defendant Perlitz frequently traveled from Connecticut to the Republic of Haiti to reside for extended periods of time in the Republic of Haiti.  On December 21, 2010, the United States District Court for the District of Connecticut adjudged Defendant Perlitz guilty of violating 18 U.S.C. §2423(b), Travel With Intent To Engage In Illicit Sexual Conduct.  Perlitz was sentenced to serve 19 years and 7 months in federal prison.  He is currently serving his sentence in the Federal Correctional Institution in Seagoville, Texas.

10.       Defendant Haiti Fund, Inc. (the "Haiti Fund") is a corporation organization under the laws of the State of Connecticut.  Pursuant to 28 U.S.C. § 1332(c) (1), the Haiti Fund is, therefore, a citizen of Connecticut. The Haiti Fund funded, managed, controlled and directed Project Pierre Toussaint of Cap-Haitien, Haiti, a

program that provided services for minor boys in and around Cap-Haitien, Haiti.  At all relevant times, PPT operated an intake center at one location, and two different residential schools at two different locations; all the locations were in or around Cap-Haitien, Haiti.  The Director of PPT in Haiti was Perlitz.  The Haiti Fund hired Perlitz and retained him throughout the relevant time period.  At all relevant times, the Haiti Fund had a duty to exercise due case in its hiring and retention, including its hiring and retention of Perlitz.  At all times material hereto, while Perlitz was Director of PPT in Haiti, the Haiti Fund had a duty to supervise and direct him, to exercise due care in doing so, and a duty not to aid and abet Perlitz in engaging in criminal conduct.

11.     Defendant Fairfield University is a corporation organized under the laws of the State of Connecticut, with its principal place of business in Fairfield, Connecticut. Pursuant to 28 U.S.C. § 1332 (c) (1), Fairfield University is, therefore, a citizen of Connecticut.

12.     Defendant Fairfield University hired Father Carrier and retained him throughout the relevant time period.  At all relevant times, Fairfield had a duty to exercise due case in its hiring and retention, including its hiring and retention of Father Carrier.  At all relevant times, Fairfield University had a duty to supervise and direct Father Carrier and to exercise due care in doing so.

13.     Fairfield University hired Perlitz in connection with PPT and retained him during the relevant time period.  At all relevant times, Fairfield had a duty to exercise due case in its hiring and retention, including its hiring and retention of Perlitz.  At relevant times, Fairfield University had a duty to supervise and direct Perlitz and to exercise due care in doing so.

14.     During the relevant time period, Fairfield University placed employees, officers, or agents of Fairfield University in management and/or leadership positions of

4

the Haiti Fund.  At all relevant times, such employees, officers, or agents of Fairfield University held positions of management and/or leadership at the Haiti Fund.

15.    At all relevant times, Fairfield University represented that the Haiti Fund was engaged in activities supported, managed and sponsored by Fairfield University.

16.    Defendant The Society of Jesus of New England (the "New England Jesuit Order") is a not-for-profit corporation organized under the laws of the Commonwealth of Massachusetts and doing business in Connecticut.  Pursuant to 28 U.S.C. § 1332 (c)(1), the New England Jesuit Order is a citizen of the Massachusetts. The New England Jesuit Order hired Father Carrier and retained him throughout the relevant time period.  At all relevant times, the New England Jesuit Order had a duty to exercise due case in its hiring and retention, including its hiring and retention of Father Carrier.  At all relevant times, the New England Jesuit Order had a duty to supervise and direct Father Carrier and to exercise due care in doing so.

17.    Defendant Father Paul E. Carrier, S.J. ("Father Carrier") is an individual who is a citizen of the State of Connecticut with a domicile in Bridgeport, Connecticut. During the relevant time period, Father Carrier was a religious priest of the New England Jesuit Order; University Chaplain/Director of Campus Ministry and Community Service of Fairfield University; and Chairman, President and/or Vice-President of the Haiti Fund.  Father Carrier hired Douglas Perlitz and retained him throughout the relevant time period.  At all relevant times, Father Carrier had a duty to exercise due care in his hiring and retention, including his hiring and retention of Perlitz.  At all relevant times, Father Carrier had a duty to supervise and direct Perlitz, to do so with due care, and a duty not to aid and abet Perlitz in engaging in criminal conduct.

18.    Defendant Hope E. Carter is an individual who is a citizen of the State of

Connecticut with a domicile in New Canaan, Connecticut.  During the relevant time period Defendant Carter was a member of the Board of Directors of the Haiti Fund; Secretary of the Board of Directors of the Haiti Fund; and at times material hereto, had a duty to supervise and direct Perlitz, to do so with due care, and a duty not to aid and abet Perlitz in engaging in criminal conduct.

19.    Defendants John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five are individuals whose identities are presently unknown to Plaintiff; therefore, Plaintiff files the above-captioned action against Defendants John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five by such fictitious names.  Defendants John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five are citizens of the State of Connecticut or other states of the United States.  Plaintiff will seek leave to amend this Complaint to add the true name or names of Defendants John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five when said name or names have been ascertained.  Plaintiff alleges that Defendants John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five aided and abetted Defendant Perlitz in engaging in criminal conduct which resulted in harm to the Plaintiff.

20.    Defendants John Doe Six, John Doe Seven, John Doe Eight, John Doe Nine, and John Doe Ten are individuals whose identities are presently unknown to Plaintiff; therefore, Plaintiff files the above-captioned action against Defendants John Doe Six, John Doe Seven, John Doe Eight, John Doe Nine, and John Doe Ten by such fictitious names. Defendants John Doe Six, John Doe Seven, John Doe Eight, John Doe Nine, and John Doe Ten are citizens of the State of Connecticut or other states of the United States.  Plaintiff will seek leave to amend this Complaint to add the true name or names of Defendants John Doe Six, John Doe Seven, John Doe Eight, John Doe Nine, and John

6

Doe Ten when said name or names have been ascertained. Plaintiff alleges that Defendants John Doe Six, John Doe Seven, John Doe Eight, John Doe Nine, and John Doe Ten were responsible for the hiring, supervision, direction and retention of Defendant Perlitz.

21.    Defendants John Doe Eleven and John Doe Twelve are individuals whose identities are presently unknown to the Plaintiff; therefore, Plaintiff files the above-captioned action against Defendants John Doe Eleven and John Doe Twelve by such fictitious names. Defendants John Doe Eleven and John Doe Twelve are citizens of the State of Connecticut or other states of the United States. Plaintiff will seek leave to amend this Complaint to add the true name or names of Defendants John Doe Eleven and John Doe Twelve when said name or names have been ascertained. Plaintiff alleges that Defendants John Doe Eleven and John Doe Twelve were responsible for the hiring, supervision, direction and retention of Defendant Father Carrier.

## STATEMENT OF FACTS

**Background**

22.    At all relevant times Father Carrier was a religious priest of New England Jesuit Order and was subject to supervision and direction of the New England Jesuit Order.

23.    At all relevant times the New England Jesuit Order has stated and represented that it operated Fairfield University.

24.    Over the last four decades the New England Jesuit Order has had several members who have sexually abused numerous children.  Rather than take timely action to prevent sexual abuse of children, the New England Jesuit Order's practice has been years later to pay hundreds of thousands, if not millions, of dollars in compensation for the harm its members caused to children.  The New England Jesuit Order's

7

management and supervision in this case was, sadly, consistent with the way it managed other instances involving the sexual abuse of children.

25.    In approximately 1988, Father Carrier, then University Chaplain of Fairfield University, engaged in a sexual relationship with a freshman at Fairfield University.  Although this sexual relationship with a young student at Fairfield University should have put Fairfield University and the New England Jesuit Order on notice that Father Carrier was a person of bad character who could not maintain nor understand appropriate boundaries with vulnerable individuals, neither Fairfield University nor the New England Jesuit Order disciplined Father Carrier.

26.    Perlitz told a number of his victims that Father Carrier was the one who introduced Perlitz to homosexual activities when Perlitz was a student, at a time when Father Carrier was Chaplain for Fairfield University, operated by the New England Jesuit Order.

27.    In approximately 1997, Perlitz, with the assistance of Father Carrier, Carter, Fairfield University, and John Doe Six through John Doe Ten obtained funding from the Order of Malta to start and operate Project Pierre Toussaint ("PPT"), a school for boys in Cap-Haitien, Haiti.  PPT established an intake center that came to be referred to as the 13th Street Intake Program.  PPT provided services to boys of all ages, many of whom were street children.  The youngest children served by PPT were six years of age.  PPT provided a variety of services to the minor boys, including but not limited to, meals, access to running water for baths or showers, basic classroom instruction, and sports activities.  Perlitz employed both Americans and Haitians to work at PPT.

28.    In or about 1999, with the assistance of Father Carrier, Carter, the Haiti Fund, Fairfield University, and John Doe Six through John Doe Ten, Perlitz obtained additional funding to expand PPT to include a residential facility referred to as the

Village.

29.     From the formation of the Haiti Fund, Father Carrier served as a director of the Haiti Fund.  Within a year of the formation of the Haiti Fund, Father Carrier became an officer of the Haiti Fund.  To have served as an officer of the Haiti Fund, the rules governing the conduct of the New England Jesuit Order required the New England Jesuit Order to give permission to Father Carrier to engage in the work of the Haiti Fund and to accept positions of authority and responsibility from the Haiti Fund.

30.     At all relevant times, the New England Jesuit Order has stated that it may send its members anywhere in the world to serve.  At all relevant times, members of the New England Jesuit Order have often been sent on missions to areas operated by other provinces in places around the world, including Haiti.

31.     Throughout most of the first decade of the 21st century, Defendants continued to provide funding and other support to PPT and specifically to Perlitz to allow him to continue operating PPT.  Under the direction of Father Carrier, Fairfield University, which was operated by the New England Jesuit Order, supplied student volunteers through its Mission Volunteers program; at all relevant times, the volunteers worked at PPT and were supervised in that work by Father Carrier on behalf of Fairfield University and the New England Jesuit Order.

32.     During relevant times, Jesuits in training were sent to work at PPT.

33.     During relevant times, Fairfield University, which was operated by the New England Jesuit Order, raised over $600,000 for the Haiti Fund at events held at Fairfield University.  Fairfield University transferred those monies either to PPT or the Haiti Fund.  During relevant years Fairfield University directly funded the Haiti Fund with $51,000.

34.     Fairfield University, which was operated by the New England Jesuit

Order, from 1997 through 2006, paid Father Carrier, a Jesuit and then University Chaplain/Director of Campus Ministry and Community Service of Fairfield University approximately $97,500 from restricted accounts.  Some or all of this money was spent to support Father Carrier's activities with PPT.   In addition, from 1997 through 2006, another $23,000 was paid by Fairfield University to Father Carrier for undetermined purposes, some or all of which may have been used to support Father Carrier's activities with PPT.

35.     From at least 1999 to sometime in 2008, Defendant Perlitz travelled from the Republic of Haiti via airline flights to the States of Florida and New York.  From Florida and New York Perlitz would then travel to Connecticut to engage in fundraising to raise substantial funds for the Haiti Fund from residents of Connecticut, New York and other states to support activities of PPT in Haiti. After engaging in such fundraising in and around this time period, Perlitz would then travel from Connecticut to Florida and New York where Perlitz purchased airline tickets to return to Haiti. From at least 1999 to sometime in 2008, Father Carrier and Carter participated in raising substantial funds for the Haiti Fund from residents of Connecticut, New York and other states to support activities of PPT in Haiti.   In and around this time period Father Carrier and Carter would regularly travel from Connecticut to Florida or New York where they purchased airline tickets to travel to Haiti to visit and supervise PPT. Father Carrier and Carter would then return from Haiti via airline flights to Florida or New York and then travel back to Connecticut.

36.     From prior to 2003 to sometime in 2008, Perlitz and the Haiti Fund, either directly or through PPT, purchased supplies in the United States which were taken to Haiti and used at PPT.

37.     Until the time Perlitz ceased to direct PPT, Fairfield University, operated

10

by the New England Jesuit Order, promoted PPT as a mission in which Fairfield University students or prospective students could participate.  Until the time Perlitz ceased to direct PPT, Fairfield University marketed PPT as a program to attract prospective students to Fairfield University.

38.     Through PPT, Perlitz had access to, authority over, and control over the boys attending or receiving services at PPT.  At all relevant times, Father Carrier, Carter, the Haiti Fund, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Ten knew about Perlitz's access to, authority over, and control over the boys at PPT.

39.     Through his role at PPT, Perlitz was in a position that the minor boys attending or receiving services at PPT would believe they could trust him.  At all relevant times, Father Carrier, Carter, the Haiti Fund, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Ten knew that because of Perlitz's position, the minor boys participating in PPT would believe they could trust Perlitz.

40.     Through his role at PPT, Perlitz was in a position that the minor boys attending or receiving services at PPT would have confidence that the conduct Perlitz engaged in was to further their best interests.  At all relevant times, Father Carrier, Carter, the Haiti Fund, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Ten knew that because of Perlitz's position, the minor boys participating in PPT would have confidence that the conduct Perlitz engaged in was to further their best interests.

41.     Father Carrier, Carter, and John Doe One through John Doe Five frequently traveled to Cap-Haitien, Haiti to visit Perlitz and Project Pierre Toussaint, or otherwise participated in activities at PPT.  Father Carrier, Carter and John Doe One

through John Doe Five became aware that Perlitz was engaged in conduct that endangered minor boys participating in PPT.   In spite of this information, Father Carrier, Carter, and John Doe One through John Doe Five aided and abetted Perlitz in Perlitz's efforts to sexually abuse minor boys participating in PPT and in Perlitz's efforts to conceal his sexual abuse of minors participating in PPT.

42.     Perlitz abused his position at PPT and betrayed the trust the minor boys placed in him by abusing many of the minor boys in his care.

**Perlitz's Abuse of Boys at PPT**

43.     Perlitz employed several different tactics in his abuse of the minor boys in his care.  In many instances, Perlitz suggested that boys sleep at his home in Bel Air, Haiti, near Cap-Haitien, rather than at a PPT residential facility.   Indeed, although the boys at PPT were supposed to sleep at PPT's residential facilities, Perlitz frequently had several boys stay at Perlitz's home in Bel Air. Often one or more boys slept in Perlitz's bedroom, while Perlitz was also sleeping there.   More than one of the boys lived outright at Perlitz's home in Bel Air for a substantial period of time.

44.     While the boys were sleeping, or about to sleep, Perlitz would begin molesting them and/or demanding that they engage in sexual conduct with him.

45.     Prior to Perlitz sexually assaulting the minor victims, Perlitz often provided intoxicating substances to the the minor victims to cloud their judgment and weaken their resistance.

46.     In other instances, Perlitz would demand sexual favors in exchange for shoes, clothing, money or other necessities.  Boys who were willing to accede to Perlitz's demand were provided with new clothes and shoes, as well as cash, while boys who refused Perlitz's demands were forced to go without basic necessities.

47.     In many instances, Perlitz would cause the boys to believe that for those

boys to continue to live at PPT's facilities where the boys were provided room, board and educational services, the boys had to engage in sexual activity with Perlitz.  Those boys understood if they could not continue to live at PPT's facilities, they were faced with the stark reality that they would have to return to living on the streets.

48.     Perlitz caused minor boys at PPT to engage in commercial sex by pressing them to engage in sexual acts in exchange for cash, food, shelter, shoes, clothing or other necessities.  Perlitz further recruited, enticed, and maintained these minor boys knowing that he would cause them to engage in these commercial sex acts.

49.     When boys at PPT would ask Perlitz at his office for financial assistance to buy necessities, such as shoes or clothes, Perlitz would direct those boys to request that financial assistance from the Haitian administrator of one of PPT's residential facilities. When those boys would leave Perlitz's office, Perlitz would then call that PPT administrator and direct that administrator to deny the requested financial assistance. After rejection from the administrator, those boys appealed to Perlitz who then demanded sex in exchange for financial assistance.

50.     Perlitz kept pornographic photos and films on his computer.   On numerous occasions, Perlitz showed this material to the boys he was molesting.

**Notice of Perlitz's Activities**

51.     At all relevant times, Father Carrier, Carter, Fairfield University, operated by the New England Jesuit Order, the New England Jesuit Order itself, and the Haiti Fund knew that PPT was providing basic services to extremely vulnerable Haitian minor children. At all relevant times, the Defendants knew that these vulnerable Haitian minor children had no place to sleep, except at PPT's residential facilities; had no educational opportunity, except at PPT facilities; and had no funds for necessities, such as clothes and food, except for the funds PPT gave these minor children.

13

52.     Staff members from PPT were present at Perlitz's home in the morning when minor boys who had spent the night in Perlitz's bedroom were there and had obviously spent the night.

53.     American staff members from PPT, including volunteers from Fairfield University which was operated by the New England Jesuit Order, and apparently directly from the New England Jesuit Order, all under the supervision of Father Carrier, also resided in Perlitz's house in Bel Air.  These staff members saw minor boys in the evening and then saw those same boys in Perlitz's Bel Air house early the next morning. These staff members further saw boys in Perlitz's bedroom in Perlitz's Bel Air house during the day, and at bedtime saw boys go to sleep in Perlitz's bedroom.

54.     Some of the boys who were anally raped by Perlitz in Perlitz's bedroom complained loudly while Perlitz penetrated them, such that other persons in the house could have and would have heard them.

55.     On several occasions, boys who had been abused by Perlitz told staff at PPT about the abuse. For example, several of the boys that Perlitz abused told Margaret Joseph, a psychologist/social worker employed by the Haiti Fund and/or PPT about the abuse.  At least one boy told one of the tutors.  Other staff members, including teachers, drivers, and a cook were aware that Perlitz was sexually abusing some of the boys at PPT.  Some of the staff at PPT who were informed of the abuse were Americans, while others were Haitian.

56.     Father Carrier and Carter travelled frequently to Haiti to visit PPT and meet with Perlitz at Perlitz's house in Bel Air.  Many, if not all, of the boys that Perlitz abused knew both Father Carrier and Carter from their frequent visits.  The boys who knew Father Carrier and Carter respected and trusted Father Carrier and Carter.  Father Carrier, a New England Jesuit Order religious priest and University Chaplain/Director

14

of Campus Ministry and Community Service of Fairfield University often celebrated mass for the PPT minor students.

57.     Father Carrier and Carter failed to speak to the boys in a setting where the boys could feel safe about reporting what they were experiencing at PPT.  If Father Carrier and/or Carter learned of the abuse from the numerous staff persons who knew about it, including American staff persons and volunteers under Father Carrier's supervision, they failed to take any steps to stop it or address it in any way.

58.     For a number of years Father Carrier regularly met with a PPT Haitian staff administrator in Cap-Haitien to inquire about the PPT and the children served by PPT. When that Haitian staff administrator learned that Perlitz was sexually abusing minors, he confronted Perlitz and tried to stop Perlitz from continuing this behavior. Thereafter Father Carrier stopped consulting, or even greeting that PPT Haitian staff administrator.

59.     Not only did Father Carrier and Carter neglect to seek out information about Perlitz's conduct of PPT, they ignored warning signs that Perlitz was engaged in improper relationships with the minor boys at PPT, including:

> a.  Father Carrier and Carter were present in Perlitz's Bel Air house while minor boys participating in PPT were also there.  Both Father Carrier and Carter saw minor boys from PPT in Perlitz's bedroom in Perlitz's Bel Air house.  Because PPT had residential facilities, there was no legitimate reason for the boys to be present at Perlitz's home, even less to be in his bedroom in Perlitz's Bel Air house.

> b.  Father Carrier saw Perlitz show at least one PPT student a pornographic video on Perlitz's computer in Perlitz's bedroom in Perlitz's Bel Air house.

> c.  Both Father Carrier and Carter were aware that at least one of the boys

was living in Perlitz's Bel Air house.

    d.  On at least one occasion, Father Carrier was present when Perlitz arranged a rendezvous at Perlitz's Bel Air house with one of the boys for late in the evening.

    e.  Father Carrier was present when Perlitz hugged one PPT minor student so that the front of Perlitz's body was pressed against the back of that minor's body.

    f.  Father Carrier spent an evening at Perlitz's Bel Air house in an upstairs bedroom when another minor slept in Perlitz's bedroom downstairs and was sexually abused by Perlitz that evening.  Father Carrier knew that yet another minor was sleeping in Perlitz's bedroom in Perlitz's Bel Air house.

60.    All of these circumstances should have alerted Father Carrier and Carter that something was amiss in Perlitz's dealings with the boys in his care at PPT.  During all these events Father Carrier and Carter were officers of the Haiti Fund.   During all these events Father Carrier was a New England Jesuit Order religious priest and University Chaplain/Director of Campus Ministry and Community Service of Fairfield University which was operated by the New England Jesuit Order.

61.    The visits to PPT by Father Carrier, a religious priest of the New England Jesuit Order, and Carter, who had previously been appointed to, or elected to, leadership positions in Catholic affiliated organizations, such as the Order of Malta and the Canterbury School of New Milford, Connecticut, occurred at a time when those in leadership positions of organizations affiliated with the Catholic Church were well aware of the potential for sexual abuse of minor children by adults charged with looking after their well-being.  In 1995, the National Conference of Catholic Bishops released a document entitled "Walk in the Light:  a Pastoral Response to Child Sex

16

Abuse."  The document recognized the problem of child sex abuse and the need for the church to take steps to address it.    In 2002, the United States Conference of Catholic Bishops at a widely publicized meeting issued a document entitled "Charter for the Protection of Children and Young People."  This document recognized the need for clear and well-publicized "standards of ministerial behavior and appropriate boundaries for clergy and for any other church personnel in positions of trust who have regular contact with children and young people."  The New England Jesuit Order states that it abides by the "Charter for the Protection of Children and Young People."  In addition, the New England Jesuit Order in January 2006 promulgated the New England Jesuit Order's "Ethics in Ministry Policies" which proscribed the conduct in which Perlitz engaged.

62.    Thus, by the time that Perlitz was abusing minor boys in his care, the Catholic Church and its affiliates had been put on notice of the problem of child sex abuse and of the signs that a clergy member or a lay adult in charge of children was engaging in improper relationships with those children.  Nonetheless, neither Father Carrier, nor Fairfield University, operated by the New England Jesuit Order, nor the New England Jesuit Order itself, nor Carter nor the Haiti Fund – took any steps to protect the children in Perlitz's care. On the contrary, they facilitated Perlitz's crimes by continuing to provide him money and facilities to run PPT in the face of evidence that Perlitz was maintaining inappropriate relationships with boys in his care.

63.    Carter did not stop at facilitating Perlitz's abuse of children and ignoring it; she sought to prevent him from getting caught.  In 2008, when Perlitz was under investigation for molesting children in Haiti, Carter, an officer of the Haiti Fund, flew to Haiti and removed one or more of Perlitz's computers, which contained pornographic material, from his house and took them with her to the United States, to prevent the

pornographic material on the computers from being discovered by private investigators and ultimately law enforcement personnel.  A year after Carter spirited the computers away from investigators, one of these computers was seized when Perlitz was arrested a year later.  United States investigators found that Perlitz had used that computer to visit websites focusing on sexual material relating to boys, such as EXTREME-GAYBOYS.COM, www.photosgayboys.com/teenboys, and www.spankteenboys.com.

64.     From 1999 until 2008 the Haiti Fund, with substantial participation of Fairfield University, raised millions of dollars to support Perlitz's activities with PPT.  Perlitz used portions of these funds to groom his minor victims and to provide them with gifts or money in exchange for sexual acts.  The Haiti Fund and Fairfield University, operated by the New England Jesuit Order, failed to institute generally-accepted safeguards – or any safeguards -- to prevent the abuses which occurred.

**Facts Pertaining to Joseph Jean-Charles**

65.     From in or around 2004, when Plaintiff Joseph Jean-Charles was approximately 14 years of age, through in or around 2005, Defendant Perlitz, while in Haiti, engaged in explicit sexual behavior and lewd and lascivious behavior with Plaintiff, including but not limited to Defendant Perlitz engaging in illicit sexual conduct with Plaintiff.

66.     Without limiting either the generality of the preceding paragraph or the specific number of instances of illicit conduct, during the time period referenced above, Defendant Perlitz coerced Plaintiff into performing illicit sexual conduct by means of implicit threats to Plaintiff to the effect that he would be thrown out of PPT and henceforth be denied access to the benefits and comforts of PPT.  Among other things, Perlitz engaged in inappropriate touching of Plaintiff's genitals and buttocks and forced Plaintiff to masturbate Perlitz to ejaculation.

67.     Without limiting either the generality of the two immediate preceding paragraphs or the specific number of instances of illicit conduct, during the time period referenced above, Defendant Perlitz provided money and other things of value to Plaintiff in return for illicit sexual conduct, including giving him cash, purchasing clothes and paying for a hotel room for Plaintiff in Port-au-Prince, Haiti.

68.     During the time period of Plaintiff's abuse by Defendant Perlitz, Defendant Father Carrier, who as described earlier was on notice as to the dangers Perlitz posed to minors,  was present at Perlitz's Bel Air house in Haiti when Plaintiff was in that house.

69.     As a result of Defendant Perlitz's illicit sexual conduct, lewd and lascivious conduct, coercion and providing things of value to a minor for sex acts, Plaintiff has suffered deep emotional and physical pain, is suffering deep emotional and physical pain, and will suffer future deep emotional and physical pain.

70.     At all times material hereto, Defendant Perlitz misrepresented and concealed from Plaintiff the wrongful nature of the sexual and related activity and that such activity could harm Plaintiff.

71.     Victims of child sex abuse frequently have difficulty remembering the full extent of the abuse they suffered or, even when they do recall, may be unable to communicate all of the details of that abuse.  They may also be unaware, or unable to communicate, the full extent of injury they have suffered from such abuse.  As a victim of Perlitz's sexual abuse, Plaintiff is unable at this time to fully describe all of the details of that abuse and the extent of the harm he suffered as a result.

## PLAINTIFF JOSEPH JEAN-CHARLES' CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Civil Remedy for Personal Injuries Pursuant to 18 U.S.C. § 2255
(against Defendant Perlitz)**

72.     Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-71 set forth above.

73.     Defendant Perlitz violated 18 U.S.C. § 2423(b), Travel With Intent To Engage In Illicit Sexual Conduct and was convicted of doing so.   Plaintiff, while a minor, was a victim of Defendant Perlitz's violation of 18 U.S.C. § 2423(b).

74.     Plaintiff has suffered substantial injuries as a result of Defendant Perlitz's violations of 18 U.S.C. § 2423(b).

75.     By reason of the foregoing, Perlitz is liable to Plaintiff  for damages in an amount to be proved at trial, as well as the cost of this suit, and reasonable attorney's fees pursuant to 18 U.S.C. § 2255.

### PLAINTIFF'S SECOND CLAIM FOR RELIEF:

**Civil Remedy for Personal Injuries Pursuant to 18 U.S.C. § 2255
(against Defendants Father Carrier, Carter, the Haiti Fund, John Doe One, John Doe Two, John Doe Three, John Doe Four and John Doe Five)**

76.     Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-75 above.

77.      Defendant Perlitz violated 18 U.S.C. § 2423 (b), Travel With Intent To Engage In Illicit Sexual Conduct.

78.     Defendants Father Carrier, Carter, the Haiti Fund, John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five aided and abetted Defendant Perlitz in violating 18 U.S.C. § 2423 (b).

79.     Defendants Father Carrier and Carter were accessories after the fact to Perlitz's violation of 18 U.S.C. § 2423 (b).

80.     Plaintiff, while a minor, was a victim of the above referenced violations of 18 U.S.C. § 2423 (b), which Defendants Father Carrier, Carter, Haiti Fund, John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five aided and abetted Defendant Perlitz in committing and/or were accessories after the fact to those violations.

81.     Plaintiff has suffered substantial injuries as a result of the assistance provided by Defendants Father Carrier, Carter, Haiti Fund, and John Doe One through John Doe Five to Defendant Perlitz for the purpose of aiding and abetting Defendant Perlitz's violation of 18 U.S.C. §2423 (b) and/or the assistance provided to Defendant Perlitz after the fact.

82.     By reason of the foregoing, Defendants Father Carrier, Carter, Haiti Fund, and John Doe One through John Doe Five are liable to Plaintiff for damages in an amount to be proved at trial, as well as the cost of this suit, and reasonable attorney's fees pursuant to 18 U.S.C. § 2255.

### PLAINTIFF'S THIRD CLAIM FOR RELIEF
### Violation of Customary International Law
### (against Defendant Perlitz)

83.     Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-82 above.

84.     It is long settled that the law of Nations is part of federal common law, and that federal courts are empowered to address claims against those that commit, aid, or abet violations of international law.

85.     Sexual abuse of children violates the norms of customary international law.

86.     The withholding of food, shelter, clothing, shoes, or money in order to coerce children to engage in unwanted sexual acts violates the norms of customary

international law.

87.     Coercing impoverished children into accepting food, shelter, clothing, shoes, or money in exchange for unwanted sexual acts violates the norms of customary international law.

88.     The international norms governing sexual abuse and exploitation of children are recognized in the United Nations Convention on the Rights of the Child (UNCRC), to which United States is a signatory.  Article 4 of the UNCRC provides:

> States Parties undertake to protect the child from all forms of sexual exploitation and sexual abuse. For these purposes, States Parties shall in particular take all appropriate national, bilateral and multilateral measures to prevent:
>
> (a) The inducement or coercion of a child to engage in any unlawful sexual activity;
>
> (b) The exploitative use of children in prostitution or other unlawful sexual practices;
>
> (c) The exploitative use of children in pornographic performances and materials.

89.     Sexual abuse has been further recognized in international law in the United Nations Committee Against Torture's Initial Report, as a cruel act that violates international norms of behavior.  The Vienna Declaration of the World Conference on Human Rights urges all States

> to address the acute problem of children under especially difficult circumstances. Exploitation and abuse of children should be actively combated, including by addressing their root causes. Effective measures are required against female infanticide, harmful child labour, sale of children and organs, child prostitution, child pornography, as well as other forms of sexual abuse.

90.     Numerous other international norms recognize the special vulnerability of

children and the special need for their protection.  For example, Article 25, Section 2, of the United Nations Universal Declaration of Human Rights states that, "Motherhood and childhood are entitled to special care and assistance," and that, "[a]ll children . . . shall enjoy the same social protection." Similarly, the United Nations International Covenant on Civil and Political Rights prohibits the death sentence for offenders under the age of eighteen, requires the segregation of adults and children in prisons, and requires the protection of children in divorce proceedings.  The United Nations General Assembly Resolution on U.N. Guidelines for the Prevention of Juvenile Delinquency provides that societies must nurture children and treat them as individuals with human dignity and the need for society's protection.

91.     Similar support for the protection of children may be found in other multinational fora. For example, the Summit of the Americas Declaration of Principles and Plan of Action calls for member states to "[u]ndertake all measures necessary to guarantee the rights of children."  The Paris Economic Summit declared that "the rights of the child . . . require special protection."

92.     Together, these conventions, reports, guidelines and other documents show a near-universal recognition of the need to protect children from exploitation and abuse, including sexual abuse and child prostitution.

93.     The international norm that prohibits sexual abuse of children is sufficiently specific, universal, and obligatory to warrant recognition in this Court.

94.     The international norm that prohibits the withholding of food, shelter, clothing, shoes, or money in order to coerce children to engage in unwanted sexual acts is sufficiently specific, universal, and obligatory to warrant recognition in this Court.

95.     The international norm that prohibits coercing impoverished children into accepting food, shelter, clothing, shoes, or money in exchange for unwanted sexual acts

is sufficiently specific, universal, and obligatory to warrant recognition in this Court.

96.     Perlitz's conduct as described herein constitutes a tort in violation of the law of the Nations.  Plaintiff suffered injury as a result of that conduct.

97.     By reason of the foregoing, Perlitz is liable to Plaintiff for tortious conduct in violation of the law of Nations in an amount to be proved at trial.

### PLAINTIFF'S FOURTH CLAIM FOR RELIEF

**Violation of Customary International Law against
(against Defendants Father Carrier, Carter, John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five)**

98.     Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-97 above.

99.     Father Carrier, Carter, John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five aided and abetted Perlitz in violating the law of Nations as described herein.

100.    It is long settled that the law of Nations is part of federal common law, and that federal courts are empowered to address claims against those that aid or abet violations of international law.

101.    Plaintiff suffered injury as a result of the tortious conduct which Father Carrier, Carter, John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five aided and abetted.

102.    By reason of the foregoing, Defendants Father Carrier, Carter, John Doe One, John Doe Two, John Doe Three, John Doe Four, and John Doe Five are liable to Plaintiff for tortious conduct in violation of the law of Nations in an amount to be proved at trial.

PLAINTIFF'S FIFTH CLAIM FOR RELIEF

**Negligent Hiring, Retention, Direction and Supervision
(against Defendants Father Carrier, Carter, the Haiti Fund, Fairfield University, the New England Jesuit Order, and John Doe Six, John Doe Seven, John Doe Eight, John Doe Nine, and John Doe Ten)**

103.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-102 above.

104.    At all times relevant to this action, the responsibilities of Father Carrier, Carter, the Haiti Fund, Fairfield University, the New England Jesuit Order, John Doe Six, John Doe Seven, John Doe Eight, John Doe Nine, and John Doe Ten (hereinafter referred to as the "Perlitz Supervisory Defendants") included the hiring, retention, direction, and supervision of Perlitz.

105.    At all times relevant to this action, the Perlitz Supervisory Defendants knew or should have known that Perlitz would interact and was interacting with individuals, including minors, and more specifically, was interacting with Plaintiff.

106.    At all times relevant to this action, the Perlitz Supervisory Defendants had a special relationship with Perlitz and/or with Plaintiff.

107.    At all times relevant to this action, the Perlitz Supervisory Defendants had a duty of care to properly hire, retain, direct, and supervise individuals of good reputation and character who, it was known, would be interacting with minors in the Republic of Haiti.

108.    At all times relevant to this action, the Perlitz Supervisory Defendants negligently breached said duty by hiring and retaining Perlitz, an individual whom the Perlitz Supervisory Defendants knew or should have known was of bad character and reputation and unable to properly interact with minors. The Perlitz Supervisory Defendants improperly and inadequately directed and supervised Perlitz.

109.    At all times relevant to this action, the Perlitz Supervisory Defendants

knew or should have known that Perlitz's intentional and negligent conduct would result in severe mental and emotional suffering by Plaintiff.

110.    As a direct and proximate result of the Perlitz Supervisory Defendants' negligent conduct, Plaintiff suffered and will continue to suffer in the future: severe and permanent mental distress and emotional injuries, financial expenses for medical and therapeutic care and treatment; lost long-term earning capacity; as well as other damages.

111.    By reason of the foregoing, the Perlitz Supervisory Defendants are liable to Plaintiff for negligent hiring, retention, direction, and supervision, in an amount to be proved at trial.

**PLAINTIFF'S SIXTH CLAIM FOR RELIEF**

**Negligent Hiring, Retention, Direction, and Supervision
(against Defendants the Haiti Fund, Fairfield University, the New England Jesuit Order, John Doe Eleven and John Doe Twelve)**

112.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-111 above.

113.    At all times relevant to this action, the responsibilities of the Haiti Fund, Fairfield University, the New England Jesuit Order, John Doe Eleven and John Doe Twelve (hereinafter referred to as the "Father Carrier Supervisory Defendants") included the hiring, retention, direction, and supervision of Defendant Father Carrier.

114.    At all times relevant to this action, the Father Carrier Supervisory Defendants knew or should have known that Father Carrier was directly managing, supervising, controlling and directing Perlitz who the Father Carrier Supervisory Defendants knew or should have known was interacting with minors, and more specifically, was interacting with Plaintiff.

115.    At all times relevant to this action, the Father Carrier Supervisory

26

Defendants had a special relationship with Father Carrier and/or with Plaintiff.

116.    At all times relevant to this action, the Father Carrier Supervisory Defendants had a duty of care to properly hire, retain, direct, and supervise individuals of good reputation and character who directly managed, supervised, controlled and directed Perlitz who was interacting on a daily basis with extremely vulnerable minors in the Republic of Haiti.

117.    At all times relevant to this action, the Father Carrier Supervisory Defendants negligently breached said duty by hiring and retaining Father Carrier, an individual whom the Father Carrier Supervisory Defendants knew or should have known was of bad character and reputation and unable to properly manage, supervise, control and direct Perlitz who was interacting on a daily basis with extremely vulnerable minors in the Republic of Haiti. The Father Carrier Supervisory Defendants improperly and inadequately directed and supervised Father Carrier.

118.    At all times relevant to this action, the Father Carrier Supervisory Defendants knew or should have known that Father Carrier's intentional and negligent conduct would result in severe mental and emotional suffering by Plaintiff.

119.    As a direct and proximate result of the Father Carrier Supervisory Defendants' negligent conduct, Plaintiff suffered and will continue to suffer in the future: severe and permanent mental distress and emotional injuries, financial expenses for medical and therapeutic care and treatment; lost long-term earning capacity; as well as other damages.

120.    By reason of the foregoing, the Father Carrier Supervisory Defendants are liable to Plaintiff for negligent hiring, retention, direction and supervision in an amount to be proved at trial.

PLAINTIFF'S SEVENTH CLAIM FOR RELIEF

**Breach of Fiduciary Duty**
**(against Defendants Father Carrier, Carter, the Haiti Fund, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Twelve)**

121.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded inn paragraphs 1-120 above.

122.    At all relevant times, Father Carrier, Carter, the Haiti Fund, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Twelve knew that PPT, operated, managed and controlled by Defendant Perlitz, was providing services to extremely vulnerable minors in the Republic of Haiti.

123.    At all relevant times, Father Carrier, Carter, the Haiti Fund, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Twelve sponsored and promoted PPT which the Defendants knew was providing services to extremely vulnerable minors in the Republic of Haiti.

124.    Father Carrier, Carter, the Haiti Fund, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Twelve each had a fiduciary obligation to the Haitian minors participating in PPT, specifically including Plaintiff.

125.    Father Carrier, Carter, the Haiti Fund, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Twelve each breached their fiduciary duty to Plaintiff.

126.    As a direct and proximate result of the breach of fiduciary duty by Defendants Father Carrier, Carter, the Haiti Fund, Fairfield University, the New England Jesuit Order, and John Doe One through John Doe Twelve, Plaintiff suffered and will continue to suffer in the future: severe and permanent mental distress and emotional injuries, financial expenses for medical and therapeutic care and treatment; lost long-term earning capacity; as well as other damages.

### PLAINTIFF'S EIGHTH CLAIM FOR RELIEF

**Vicarious Liability**
**(against Defendants Father Carrier, Carter, Haiti Fund., Fairfield University, The New England Jesuit Order, John Doe Six, John Doe Seven, John Doe Eight, John Doe Nine, and John Doe Ten)**

127.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-126 above.

128.    At all relevant times Defendant Haiti Fund funded, managed, controlled and directed Project Pierre Toussaint ("PPT").  At all relevant times, Perlitz was the Haiti Fund's agent in the Republic of Haiti managing, controlling and directing PPT.

129.    At all relevant times Father Carrier was Chairman and/or President of the Haiti Fund.  At all relevant times, Carter was a member of the Board of Directors of the Haiti Fund; during part of this time, she was the Secretary of the Board.   On numerous occasions Father Carrier and Carter traveled to Haiti to manage and oversee PPT.  At all relevant times Perlitz acted as an agent of Father Carrier and Carter.

130.    During the relevant time period, Fairfield University placed employees, officers, or agents of Fairfield University in management and/or leadership positions of the Haiti Fund.  At all relevant times, such employees, officers, or agents of Fairfield University held positions of management and/or leadership at the Haiti Fund. At all relevant times, Fairfield University represented that PPT was engaged in activities supported, managed and sponsored by Fairfield University.  At all relevant times Perlitz acted as an agent of Defendant Fairfield University.

131.    At relevant times Perlitz acted as an agent of Defendants John Doe Six, John Doe Seven, John Doe Eight, John Doe Nine, and John Doe Ten.

132.    Through PPT, Perlitz was in a position that the minor boys participating in PPT would believe they could trust him.  Through PPT, Perlitz was in a position that the minor boys participating in PPT would have confidence that Perlitz's conduct was

29

to further the best interests of the minor boys.

133.    Perlitz used the existence of his agency relationship with the Haiti Fund, Father Carrier, Carter, Fairfield University, John Doe Six, John Doe Seven, John Doe Eight, John Doe Nine, and John Doe Ten to gain the trust and confidence of Plaintiff so that Perlitz could sexually molest Plaintiff and, using the existence of that agency relationship and the trust it engendered, did, in fact, molest Plaintiff.

134.    As a direct and proximate result of the above-described conduct, Plaintiff suffered and will continue to suffer in the future: severe and permanent mental distress and emotional injuries, financial expenses for medical and therapeutic care and treatment; lost long-term earning capacity; as well as other damages.

**PLAINTIFF'S NINTH CLAIM FOR RELIEF**

**Civil Remedy for Personal Injuries Pursuant to 18 U.S.C. § 1595
(against Defendant Perlitz)**

135.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-134 above.

136.    Perlitz caused Plaintiff, who was then under the age of 18, to engage in commercial sex in Haiti by pressing him to engage in sexual acts in exchange for cash, food, shelter, shoes, clothing or other necessities.  Perlitz further recruited, enticed, and maintained Plaintiff knowing that Perlitz would cause him to engage in these commercial sex acts.  The money to finance Perlitz's venture came from the United States, so that Perlitz's conduct affected foreign commerce.

137.    Perlitz's acts constitute a violation of 18 U.S.C. § 1591 which prohibits sex trafficking of children.  Plaintiff was a victim of Perlitz's violations of § 1591.

138.    By reason of the foregoing, Perlitz is liable to Plaintiff for damages in an amount to be proved at trial, as well reasonable attorney's fees pursuant to 18 U.S.C. § 1595.

30

**PLAINTIFF'S TENTH CLAIM FOR RELIEF**

**Civil Remedy for Personal Injuries Pursuant to 18 U.S.C. § 1595
(against Defendants Father Carrier and Carter)**

139.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-138 above.

140.    Father Carrier and Carter knew that Perlitz was violating or had violated 18 U.S.C. 1591.

141.    Father Carrier and Carter aided and abetted Perlitz in violating 28 U.S.C. § 1591 and are liable under that statute to the same extent as Perlitz.

142.    Father Carrier and Carter attempted to obstruct, interfere with or prevent the enforcement of 28 U.S.C. § 1591.

143.    Plaintiff was a victim of the violations of § 1591 that were aided and abetted by Father Carrier, Carter, the Haiti Fund, John Doe One, John Doe Two, John Doe Three, John Doe Four and John Doe Five.

144.    Father Carrier and Carter provided comfort and assistance to Perlitz to hinder or prevent Perlitz's apprehension or punishment.  Father Carrier and Carter were accessories after the fact as defined by 18 U.S.C. § 3.

145.     Plaintiff was a victim of the comfort and assistance Father Carrier and Carter provided to Perlitz to prevent Perlitz's apprehension or punishment as such conduct delayed relief for the substantial emotional harm Defendants' conduct caused Plaintiff.

146.    By reason of the foregoing, Father Carrier, Carter, the Haiti Fund, John Doe One, John Doe Two, John Doe Three, John Doe Four and John Doe Five are liable to Plaintiff for damages in an amount to be proved at trial, as well reasonable attorney's fees pursuant to 18 U.S.C. § 1595.

### PLAINTIFF'S ELEVENTH CLAIM FOR RELIEF

**Civil Remedy for Personal Injuries Pursuant to 18 U.S.C. § 1595
(against Defendants the Haiti Fund, John Doe One, John Doe Two, John Doe Three, John Doe Four and John Doe Five)**

147.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-146 above.

148.    The Haiti Fund, John Doe One, John Doe Two, John Doe Three, John Doe Four and John Doe Five aided and abetted Perlitz in violating 28 U.S.C. § 1591 and are liable under that statute to the same extent as Perlitz.

149.    Plaintiff was a victim of the violations of § 1591 that were aided and abetted by the Haiti Fund, John Doe One, John Doe Two, John Doe Three, John Doe Four and John Doe Five.

150.    By reason of the foregoing, the Haiti Fund, John Doe One, John Doe Two, John Doe Three, John Doe Four and John Doe Five are liable to Plaintiff for damages in an amount to be proved at trial, as well reasonable attorney's fees pursuant to 18 U.S.C. § 1595.

### PLAINTIFF'S TWELFTH CLAIM FOR RELIEF

**Civil Remedy for Personal Injuries Pursuant to 18 U.S.C. § 1595
(against Defendants Father Carrier, the Haiti Fund and Fairfield University)**

151.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation heretofore pleaded in paragraphs 1-150 above.

152.    The Haiti Fund and Fairfield University have knowingly benefitted financially from PPT by touting their involvement in PPT as a basis for fund-raising activities.  The Haiti Fund and Fairfield University have received contributions based on and/or because of their involvement in PPT.

153.    Father Carrier knowingly benefitted financially from PPT in that Father Carrier was an officer of the Haiti Fund, which received large sums of money,

32

apparently with substantial sums not accounted for.

154.    Father Carrier, the Haiti Fund, and Fairfield University knew or should have known that PPT, through Perlitz, was engaged in activities in violation of 18 U.S.C. § 1591.

155.    By reason of the foregoing, Father Carrier, the Haiti Fund and Fairfield University are liable to Plaintiff for damages in an amount to be proved at trial, as well reasonable attorney's fees pursuant to 18 U.S.C. § 1595.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff Joseph Jean-Charles respectfully demands judgment of $20,000,000 in damages against each Defendant for each claim Plaintiff Joseph Jean-Charles states against each Defendant, plus costs, interest, attorneys' fees, and such other and further relief as this Court deems just and equitable.

### PLAINTIFF'S JURY TRIAL DEMAND

Plaintiff demand a trial by jury on all claims so triable.

By Plaintiff's Attorneys,

By:    /s/    Mitchell Garabedian
       Mitchell Garabedian (phv04676)
       garabedianlaw@msn.com
       William H. Gordon (phv04677)
       garabedianlaw@earthlink.net
       LAW OFFICES OF MITCHELL GARABEDIAN
       100 State Street, 6th Floor
       Boston, MA 02109
       Phone:  (617) 523-6250

       Paul J. Hanly, Jr. (phv04680)
       phanly@hanlyconroy.com
       Andrea Bierstein (phv04678)
       abierstein@hanlyconroy.com
       HANLY CONROY BIERSTEIN SHERIDAN FISHER &
       HAYES LLP

112 Madison Ave., 7th floor
New York, New York 10016
Phone:  (212) 784-6400

Steven J. Errante (ct04292)
SErrante@ltke.com
Marisa A. Bellair (ct23802)
LYNCH, TRAUB, KEEFE, & ERRANTE, P.C.
P.O. Box 1612
52 Trumbull Street
New Haven, CT 06510
Phone:  (203) 787-0275
Fax:  (203) 782-0278